**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IGNITE ENTERPRISE SOFTWARE SOLUTIONS, LLC and IGNITETECH CX SOLUTIONS, LLC | § § § § | |
| Plaintiffs, | § § | C.A. No. |
| v. | § § | JURY TRIAL DEMANDED |
| NGDATA, US INC. and NGDATA N.V. | § § § | |
| Defendants. | § § | |

**PLAINTIFFS' COMPLAINT**

Plaintiffs Ignite Enterprise Software Solutions, LLC and IgniteTech CX Solutions, LLC (collectively "Plaintiffs" or "Ignite") file this Complaint for trade secret misappropriation, tortious interference with contract, and patent infringement against NGDATA, US Inc. and NGDATA N.V. (collectively, "NGData" or "Defendants"). In support thereof, Ignite alleges as follows:

**PRELIMINARY STATEMENT**

1.      This is an action for theft of trade secrets, tortious interference with contract, and patent infringement.

2.       Ignite alleges that NGData coerced employees to abandon their agreed-to roles at Ignite, steal Ignite's intellectual property, and then join NGData, use that information to NGData's competitive advantage and interfering with Ignite's contractual relationship in the process.

3.      NGData recruited the Ignite employees with the intent to unlawfully obtain trade secrets relating to client information, infrastructure costs, and operational costs, all of which were the product of substantial investment by Ignite and were of considerable value to NGData in its

effort to develop a business that competed directly with Ignite's business, and NGData was aware of and benefited from those disclosures of confidential trade secrets.

4.       Ignite further alleges that NGData's Lily Enterprise Platform products and services (the "Lily System") infringe Ignite's patents, including U.S. Patent Nos. 10,496,726 (the "'726 patent"), 7,673,340 (the "'340 patent"), and 7,644,134 (the "'134 patent") (collectively, the "Patents-in-Suit"), relating to methods for managing an interactive system, such as a website, systems and methods for monitoring and analyzing user activity of an interactive system, and methods of analysis of the performance of defined visitor tasks at a host's website.

5.       NGData's unlawful acquisition and use of Ignite's confidential information and trade secrets constitutes trade secret misappropriation in violation of the Defend Trade Secrets Act, as well as the Delaware Uniform Trade Secrets Act.

6.       NGData's use of Ignite's patented technology constitutes patent infringement in violation of the federal patent laws.

7.       NGData's knowing and intentional interference with agreements between Ignite and BryterCX and between Ignite and its customer via the coercion of the employees and misappropriation of Ignite's trade secrets and confidential and proprietary information constitutes tortious interference with contractual and business relations.

## PARTIES

8.       Ignite Enterprise Software Solutions, LLC is a Delaware corporation with its principal place of business at 2028 E Ben White Blvd, Suite 240-2650 Austin, TX 78741. IgniteTech CX Solutions, LLC is a Delaware limited liability company with its principal place of business at 2028 E Ben White Blvd, Suite 240-2650 Austin, TX 78741.

9.     NGData, US Inc. is a Delaware corporation with its principal place of business at 530 7th Avenue, Suite 902 New York, NY 100118.

10.     NGData N.V. is a Belgian company with headquarters at Sluisweg 2, 9000 Gent. NGData N.V.'s company number is BE 0843.892.575.

### JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction for this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331; and under 28 U.S.C. § 1338(a) because this action involves claims arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*

12.     This Court has supplemental jurisdiction over the remaining claims asserted herein pursuant to 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over NGData, US Inc. based on its activities in, and/or directed to, the United States and this forum, including those identified in the allegations set forth herein, and because NGData, US Inc. is incorporated in this district.

14.     Defendant NGData N.V. is the parent company of NGData, US Inc. and its systematic and continuous actions in the United States and in this forum, including the making, using, selling, offering to sell, and/or using the infringing products, are sufficient to establish personal jurisdiction over NGData N.V.

15.     Additionally, and in the alternative, NGData N.V.'s systematic and continuous actions in the United States make it subject to personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2).

16.     Defendants have purposefully availed themselves of the laws of, and the privileges of, conducting business in this district, have established sufficient minimum contacts with this

judicial district such that it should reasonably and fairly anticipate being hauled into court in this judicial district, has purposefully directed activities at residents of this judicial district, and at least a portion of trade secret misappropriation and patent infringement claims alleged in this Complaint occurred in this judicial district.

17.    Venue is proper for NGData, USA Inc. in this judicial district under to 28 U.S.C. §1400(b) at least because NGData, US Inc. is a resident of this district and incorporated in the State of Delaware, and has committed acts of infringement, trade secret misappropriation, and tortious interference with contractual relations in this district.

18.    Venue is also proper for NGData N.V. in this District pursuant to 28 U.S.C. § 1391(c)(3) because NGData N.V. is a foreign corporation not residing in the United States.

**FACTUAL BACKGROUND**

**Ignite's Contractual and Business Relations**

19.    On January 26, 2022, Ignite purchased BryterCX, Inc. ("BryterCX") as outlined in The Asset Purchase Agreement between Ignite and Clickfox, Inc. d/b/a BryterCX and BryterCX Holdings, Inc. (the "APA"). The APA is attached hereto as **Exhibit A**.

20.    The APA transferred all shares of BryterCX to Ignite and included the transfer of Intellectual Property Rights. The APA's definition of Intellectual Property Rights includes, among other things, "… (c) trade secret rights and any and all intellectual property rights in computer software and computer software products…" and "(e) other proprietary rights in Intellectual Property of every kind and nature…" Ex. A at 13.

21.    Under the terms of the APA, ownership of all three of the Patents-in-Suit were transferred to Ignite. *Id.* at 13, 17, 19-20, 36-41.

22.    Ignite, therefore, owns all of the Intellectual Property Rights of BryterCX, including "trade secret rights and any and all intellectual property rights in computer software and computer software products," including the Patents-in-Suit.

23.    In addition to transferring all Intellectual Property Rights to Ignite pursuant to the APA, BryterCX also transferred certain key contracts that existed between BryterCX and specific clients. These "Transferred Customer Contracts" were included as Schedule 1.1(b) of the APA, the first of which is a contract with JP Morgan Chase & Co. ("JPMC"). *Id.* at 22. JPMC and BryterCX's relationship was outlined in the JPMC Master Services Agreement (the "JPMC MSA").

24.    The JPMC MSA was a highly valuable and important asset purchased by and transferred to Ignite under the APA.

25.    In connection with the APA, BryterCX and Ignite also entered into an Employee Leasing Agreement, whereby certain BryterCX employees (the "BryterCX Legacy Team") agreed to stay on and work for an approximate 3-month period from January 2022 through April 2022, specifically for the purpose of helping to transition the agreed-to Transferred Customer Contracts, including the highly valuable and important JPMC MSA. *Id.* at 52-59.

26.    The BryterCX Legacy Team was to serve a key function in ensuring the success of the transition of the JPMC contract and relationship from BryterCX to Ignite.

27.    The APA also has a choice of venue clause that provides any action brought under the APA shall be brought in Delaware. *Id.* at 10.

**Ignite's Patents**

28.    The APA transferred ownership of the three Patents-in-Suit from BryterCX to Ignite. Accordingly, Ignite is the owner and assignee of all right, title, and interest in and to the

'726 patent, the '134 patent, and the '340 patent, including the right to sue for infringement and to collect past and future damages.

**A. The '726 Patent**

29.     On December 3, 2019, the U.S. Patent and Trademark Office (the "USPTO") duly and lawfully issued the presumptively valid '726 patent, entitled "System and Method for Modifying Links Within a Web Site." A true and correct copy of the '726 patent is attached hereto as **Exhibit B**.

30.     The '726 patent relates to customizing Internet web sites and, more particularly, to customizing Internet websites based on the behavior of visitors to that Internet web site in a manner to improve the operation of the web site.  (Ex. B, '726 patent, col. 1, ll. 22-25).

31.     The '726 patent represents a major innovation, designed to overcome a long felt but unmet need.  (Ex. B, '726 patent, col. 1, ll. 54-59).  For example, there was a long felt but unmet need to implement an accurate diagnosis of a web site and deliver solutions to repair the website in an efficient manner. (Ex. B, '726 patent, col. 1, ll. 30-59).  The inventions of the '726 patent met that need by utilizing a method, device, and algorithm to track and bundle user interactions with the web site structure via a set of matrices.  (Ex. B, '726 patent, col. 1, ll. 63-66).

32.     Claim 1 of the '726 patent is exemplary of the novel and innovative contribution made by all claims of the '726 patent:

> A method for managing a network accessible web site, the method comprising:
>
> receiving, by a computer, an indication of a first structure associated with the web site, the first structure comprising a first plurality of nodes, each node representing a web resource of the web site accessible via the web site, and a first plurality of edges, each edge representing a link between web resources;

receiving, by the computer, historical session data representing previous user activity on the web site, the historical session data including user navigation from among three or more nodes of the first plurality of nodes of the web site;

determining, by the computer, based on the historical session data, a statistical correlation associated with user navigation to a first node and to a second node of the first plurality of nodes; and

responsive to determining the statistical correlation exceeds a predetermined threshold, automatically (i) determining, by the computer, a second structure associated with the web site, wherein the second structure comprises a second plurality of nodes and a second plurality of edges including a new first edge between the first node and the second node and (ii) restructuring the web site according to the second structure.

(Ex. B, '726 patent, claim 1).

## B. The '134 Patent

33.     On January 5, 2010, the USPTO duly and lawfully issued the presumptively valid '134 patent, entitled "System and Method for Analyzing System Visitor Activities." A true and correct copy of the '134 patent is attached hereto as **Exhibit C**.

34.     The '134 patent provides a unique system and method for analyzing a visitor's performance of tasks of a system, preferably web site visitor's performance of tasks, comparing expected visitor behavior with observed visitor behavior, and discovering anomalies or trends in the visitor's behavior.  (Ex. C, '134 patent, col. 1, ll. 12-16).  In other words, the '134 patent discloses an innovative task analyzer of user interaction with a system.  (Ex. C, '134 patent, col. 2 ll. 19-20).

35.     The '134 patent describes inventions that were non-routine and unconventional at the time of the relevant priority date, as well as an improvement over the prior art. For example,

7

prior art web site log analysis tools counted the most common paths visitors took through the site, but those paths were typically the home page, the home page plus the second most visited page, the home page plus the third most visited page, etc. Those paths do not have any inherent relevance to the visitor tasks the web site was designed to support, and the tools did not provide any insight into how the visitors performed variations on, entry and exit to a particular common path.  The '134 patent overcomes the limitations of the prior art by allowing for the analysis of the performance of defined visitor tasks in a web site.  (Ex. C, '134 patent, col. 1 l. 64 – col. 2 l. 23).

36.     Claim 1 of the '134 patent is exemplary of the novel and innovative contribution made by all claims of the '134 patent:

A computer implemented method for analyzing user interaction with a system, wherein the system comprises a plurality of states linked by a navigation structure and a user interface for navigating between the states, the method comprising:

defining a first task as including a predefined first sequence of user accesses to two or more of the plurality of states;

accessing user session data representative of a session of first user's interaction with the system, the session including a second sequence of user accesses to two or more of the plurality of states;

configuring a computer processor to execute a pattern-matching algorithm to compare the second sequence of user accesses in the user session data to the first sequence of user accesses in the first task to determine whether at least a portion of the first task was performed by the first user;

determining differences between the user session data and the first task if at least a portion of the first task was
performed by the first user; and

> generating a recommendation for altering one or more
> of the plurality of states of the system, based on the
> determined differences between the user session data
> and the first task, to assist future users in performing
> the first task.

(Ex. C, '134 patent, claim 1).

## C. The '340 Patent

37.    On March 2, 2010, the USPTO duly and lawfully issued the presumptively valid '340 patent, entitled "System and Method for Analyzing System User Behavior." A true and correct copy of the '340 patent is attached hereto as **Exhibit D**.

38.    The '340 patent describes a unique system and method for analyzing a user's behavior while interacting with a system, comparing expected user behavior with observed user behavior, and discovering anomalies or trends in the user's behavior, which can be used to alter the system's structure to better facilitate user tasks.  (Ex. D, '340 patent, col. 1 ll. 15-20).

39.    The invention disclosed in the '340 patent was designed to overcome several long felt needs in the art, including the needs for a system and method for monitoring user activity of an interactive system, a system and method for providing recommendations to improve an interactive system, based on the analysis of user activity, a system and method for generating reports regarding the analysis of user activity, so that further modifications can be made to the interactive system, a system and method for monitoring user activity of an interactive system, without hindering users from using the interactive system, and a system and method for defining a task as a sequence of steps within the interactive system and for analyzing whether the defined task is being completed properly by users.  (Ex. D, '340 patent, col. 1 l. 25 – col. 3 l. 24).

40.    Claim 2 of the '340 patent is exemplary of the novel and innovative contribution made by all claims of the '340 patent:

> A method for analyzing user behavior of an interactive system, the method comprising:
>
> analyzing a structure of the interactive system, the analyzing comprising:
>
> representing the interactive system as at least one state machines, wherein a first state machine is a presentation model and an optional second state machine is an application model; and
>
> creating at least one state machine Snapshot for the presentation model and, if necessary, the application model;
>
> processing log data representing user activity of the interactive system; and
>
> creating a report on user activity of the interactive system, wherein the report includes recommendations to improve the interactive system based on the user activity.

(Ex. D, '340 patent, claim 2).

41. The '340 patent describes inventions that were non-routine and unconventional at the time of the relevant priority date, as well as an improvement over the prior art, at least because they provide a unique approach to modeling system structure and behavior, and can be applied to any number of interactive systems. (Ex. D, '340 patent, col. 3, ll. 25-50).

### NGData's Theft of Trade Secrets and Tortious Interference

42. Unbeknownst to Ignite, in the days immediately before and following Ignite's purchase of BryterCX, competitor company NGData began coercing the BryterCX Legacy Team to abandon their agreed-to roles at Ignite and join NGData. Additionally, NGData knowingly solicited the BryterCX Legacy Team to steal the intellectual property Ignite had purchased from BryterCX in order to use that information to NGData's competitive advantage against Ignite in the marketplace.

43. Upon information and belief, NGData had previously entered into a nondisclosure agreement with BryterCX to do due diligence about the assets, operations, and employees of the company under the pretense of being a potential purchaser. But, instead of purchasing BryterCX as Ignite chose to do, NGData used the due diligence period to identify intellectual property and employees it wanted to steal.

44. Indeed, in the days immediately leading up to and following Ignite's purchase of BryterCX, the BryterCX Legacy Team exchanged numerous emails and had several meetings with NGData. The subject of these discussions included "comp" and "client planning," among others.

45. In emails, the BryterCX Legacy Team disclosed valuable trade secret information to NGData, which included competitive and sensitive information relating to costs, customer pricing, and internal organization and operations information that was integral to Ignite's competitive advantage in the marketplace, as well as to Ignite's successful service of the JPMC MSA and relationship.

46. Upon information and belief, one of the primary members of the BryterCX Legacy Team met with NGData and shared trade secret information that included client information, infrastructure costs, and operational costs. Shortly thereafter, this member of the BryterCX Legacy Team left to join NGData.

47. Ultimately, in addition to knowingly misappropriating Ignite's trade secrets, NGData also ended up hiring several members of the BryterCX Legacy Team. Three of those individuals directly supported the JPMC relationship and account, and two of them were listed as "Key Personnel" in the JPMC MSA. In fact, one of those BryterCX Legacy Team members coerced away by NGData served as the relationship manager of the JPMC account at BryterCX.

This individual met numerous times with NGData as part of its recruiting process and provided NGData with valuable Ignite trade secrets.

48.     In addition to recruiting and hiring the BryterCX Legacy Team, NGData also successfully coerced an individual named Nataraj Thiru to leave his position at a company called Servion and join NGData. Importantly, Servion was a JPMC approved external service provider and Nataraj Thiru was a critical resource at Servion that worked closely with Ignite to provide the contracted services to JPMC. Nataraj Thiru resigned from Servion in April 2022, and began working for NGData the following month.

49.     Upon information and belief, NGData's coercion of the BryterCX Legacy Team to join NGData and provide NGData with Ignite's trade secrets was the primary reason the JPMC MSA was not renewed. Indeed, upon informing Ignite that it would not renew its contract with Ignite, JPMC told Ignite that the departure of BryterCX staff was "jarring" and that the broken relationships with BryterCX staffers was a "critical factor."

50.     NGData knowingly misappropriated Ignite's trade secrets by wrongfully obtaining them from the BryterCX Legacy Team. These trade secrets provide a competitive advantage to Ignite in the marketplace and are being used by NGData to gain an advantage and unfairly compete against Ignite.

51.     Upon information and belief, NGData used Ignite's trade secrets to destroy Ignite's relationship with JPMC and to attempt to win business in the marketplace from existing and former customers of Ignite, including JPMC and Wells Fargo Bank. Indeed, one of the BryterCX Legacy Team members, Chesley Smith, solicited Wells Fargo Bank as a customer shortly after leaving the BryterCX Legacy Team to join NGData.

52.     NGData's misconduct has caused substantial, direct, and irreparable harm to Ignite.

53.     NGData's misappropriation of trade secrets and coercion of the BryterCX Legacy Team knowingly and intentionally interfered with the contractual relationship between Ignite and JPMC. Because of NGData's actions, Ignite has suffered great harm, and respectfully seeks relief from this Court.

**NGData's Infringing Acts**

54.     NGData uses, sells, and/or offers to sell in the United States the Lily System, described by NGData as "a fully automated solution that analyzes big data and builds individual Customer DNA in real-time to enable organizations to more effectively target customers and personalize their experiences."

**CAUSES OF ACTION**

**Count I: Violation Of Defend Trade Secrets Act**
**(18 U.S.C. 1836, *et seq*.)**

55.     Ignite hereby alleges and incorporates by reference each of the preceding paragraphs of the Complaint as though fully set forth herein.

56.     Ignite's trade secrets constitute trade secrets as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

57.     Ignite's trade secrets relate to products and services used, sold, shipped and ordered in, or intended to be used, sold, shipped and/or ordered in interstate or foreign commerce.

58.     Ignite's trade secrets derive substantial independent economic value by not being generally known to the public, and specifically by not being known to Ignite's competitors. They are not generally known within the industry and represent years of research and development. Further, Ignite undertakes reasonable efforts to maintain the secrecy of its trade secrets from disclosure, including, but not limited to, imposition of duties of confidentiality with its employees, potential customers and licensees and use of contractual agreements expressly prohibiting

improper use and disclosure of Ignite's trade secrets by its potential customers and licensees.

59.     Upon information and belief, NGData misappropriated Ignite's trade secrets by acquiring, disclosing, using, and continuing to improperly disclose and use Ignite's trade secrets to compete unfairly against Ignite in the marketplace. Further, upon information and belief, NGData knew that Ignite's trade secrets were acquired wrongfully.

60.     Upon information and belief, NGData's improper acquisition, disclosure, use, and/or continuing use of Ignite's trade secrets constitutes a violation of the Defend Trade Secrets Act.

61.     Upon information and belief, NGData's conduct and continued possession, use, and disclosure of Ignite's trade secrets has caused, and unless enjoined by the Court, will continue to cause, irreparable harm and injury to Ignite. Ignite has no other adequate remedy at law for such acts and threatened acts. Ignite, therefore, requests a permanent injunction, restraining and enjoining NGData and its affiliates, subsidiaries, directors, officers, employees, agents and representatives, and anyone acting in concert with them, from: (i) obtaining, using or disclosing Ignite's trade secrets for any purpose whatsoever; (ii) developing or marketing any products that rely on, use, or disclose any of Ignite's trade secrets; and (iii) directing NGData to return immediately all of Ignite's trade secrets in NGData's possession, custody or control.

62.     Upon information and belief, as a direct and proximate result of NGData's unlawful, tortious conduct, Ignite has been damaged and NGData has been unjustly enriched. With respect to NGData, this unjust enrichment includes value and profits attributable to Ignite's trade secrets. Thus, Ignite seeks its actual damages caused by NGData's misappropriation and any unjust enrichment obtained by NGData (including the gains, profits, and advantages obtained by NGData as a result of the wrongful acts alleged herein), as well as any other remedies available under

14

applicable law, including, if warranted, imposition of liability for a reasonable royalty for the unauthorized acquisition, disclosure, use, and continuing use of Ignite's trade secrets.

63.      Upon information and belief, NGData's misappropriation of Ignite's trade secrets was intentional, knowing, willful, and malicious. NGData knew or should have known that Ignite's trade secrets should not be misappropriated by a competitor. Thus, Ignite is further entitled to an award of exemplary damages and reasonable and necessary attorneys' fees.

## Count II: Violation of the Delaware Uniform Trade Secrets Act
### (6 Del. C. § 2001 et seq. ("DUTSA").)

64.      Ignite hereby alleges and incorporates by reference each of the preceding paragraphs of the Complaint as though fully set forth herein.

65.      NGData's prohibited and improper acquisition, disclosure, use, and/or continuing use of Ignite's trade secrets constitutes a violation of the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001 et seq.

66.      As set forth in detail above, Ignite's intellectual property, processes, client information, and other trade secrets constitute protected trade secrets under the law. This information was compiled over many years and at great expense and was purchased and is rightfully owned by Ignite. Ignite undertakes reasonable efforts to ensure that its trade secrets are kept secret, not generally known or available to the public, and not readily ascertainable by proper means. The steps taken by Ignite to protect its trade secrets include requiring its employees to maintain confidentiality of such information and requiring customers to sign contracts restricting disclosure of Ignite's trade secrets. Ignite's trade secrets provide Ignite with a competitive advantage in the marketplace that is not ascertainable by proper means by others who might use it to such an advantage.

67.      Upon information and belief, NGData misappropriated Ignite's trade secrets by

improperly acquiring, disclosing, using, and continuing to improperly disclose Ignite's trade secrets by using those trade secrets to unfairly compete against Ignite in the marketplace.

68.    Upon information and belief, NGData's improper acquisition, disclosure, use, and/or continuing use of Ignite's trade secrets constitutes a violation of the Delaware Uniform Trade Secrets Act.

69.    Upon information and belief, as a direct and proximate result of NGData's unlawful misappropriation, disclosure, use, and/or continued use of Ignite's trade secrets, Ignite has suffered and will continue to suffer substantial harm. In addition to the monetary damages already sustained by Ignite, NGData has also been unjustly enriched as a result of its unlawful conduct. Further, Ignite has been and continues to be irreparably damaged, for which there is no adequate remedy at law, and imposition of an injunction is warranted.

70.    Further, upon information and belief, NGData's misappropriation of Ignite's trade secrets was intentional, knowing, willful, and malicious. Ignite therefore seeks an award of exemplary damages pursuant to 6 Del. C. § 2002 due to NGData's willful and malicious misappropriation of Ignite's trade secrets.

71.    Pursuant to 6 Del. C. § 2003, Ignite is also entitled to recover, and hereby pleads for an award of its reasonable and necessary attorneys' fees in connection with NGData's misappropriation of Ignite's trade secrets.

## Count III: Tortious Interference With Contract

72.    Ignite hereby alleges and incorporates by reference each of the preceding paragraphs of the Complaint as though fully set forth herein.

73.    NGData was aware of the JPMC MSA and the BryterCX Legacy Team's involvement with JPMC as a BryterCX/Ignite client.

16

74.     Upon information and belief, NGData knowingly and intentionally interfered with Ignite and JPMC's agreement and the Employee Leasing Agreement between Ignite and BryterCX via the coercion of the BryterCX Legacy Team and misuse and misappropriation of Ignite's trade secrets and confidential and proprietary information, including, but not limited to, Ignite's customers, processes, cost and pricing information, and business strategies.

75.     As a direct and proximate result of NGData's interference with the JPMC MSA and the Employee Leasing Agreement, Ignite has been harmed.

76.     Ignite is entitled to a judgment for money damages against NGData as a result of its interference with Ignite's contractual relationship with JPMC in an amount to be proven at trial.

77.     Ignite is entitled to punitive damages against NGData as a result of its intentional and willful acts in interfering with Ignite's contractual relationship with JPMC.

## Count IV: Infringement of U.S. Patent No. 10,496,726

78.     Ignite hereby alleges and incorporates by reference each of the preceding paragraphs of the Complaint as though fully set forth herein.

79.     On information and belief, NGData has directly infringed and continues to directly infringe one or more claims of the '726 patent, including at least claim 1 of the '726 patent, in the state of Delaware, in this judicial district, and elsewhere in the United States by, among other things, using, selling, and offering for sale products and services that embody one or more of the inventions claimed in the '726 patent, including but not limited to the Lily System.

80.     The Lily System provides a "method for managing a network accessible web site," because it is a customer data platform/solution capable of reconstructing or managing customer experience on various interactive systems, such as a merchant's website, customer CRM systems, apps, etc.[1]



81.     The Lily System includes a real-time processing architecture for collecting data based on user activity.

---

[1] The images contained in this Complaint were obtained from YouTube at the following links:
   (i) https://www.youtube.com/watch?v=Iewq0IVEYeQ;
   (ii) https://www.youtube.com/watch?v=vxJqtElpHEo;
   (iii) https://www.youtube.com/watch?v=PW_HftTFZxY; and
   (iv) https://www.youtube.com/watch?v=gV5igsWmJ1U.



82.     The Lily System comprises "receiving, by a computer, an indication of a first structure associated with the web site," because it runs on a computer and monitors the structure or features of the website based on the website's structure (such as tabs and menus related to customer engagement) that is further used for website personalization.

83.     The Lily System analyzes website structural data corresponding to session data, a "first structure associated with the website," that includes different categories and products or "nodes" representing "a web resource."

84.     The "Listen Layer" of the Lily System gathers customer interaction data with the website, or "historical session data representing previous user activity," including data relating to customer interaction and "navigation" on different web pages of the website.



85.    The "Learn Layer" of the Lily System has a "Calculation Engine" running on the computer, which analyzes all of the session data and computes the behavior of the customer with the webpages or creates a "statistical correlation associated with user navigation" between the webpages.  For example, the Lily System provides a predictive score and other analytics associated with a user interaction.



86.   By determining typical customer interaction behavior or the "statistical correlation," the Lily System "automatically" generates recommendations and also "restructures" the website using machine learning algorithms.



87.   By using, selling, and offering the Lily System in the United States NGData has injured Ignite and is liable to Ignite for directly infringing, either literally or under the doctrine of equivalents, one or more claims of the '726 patent, including, without limitation, claim 1, pursuant to 35 U.S.C. § 271(a).

88.   On information and belief, NGData has had knowledge of the '726 patent prior to the filing of this Complaint, as of the date NGData entered into a nondisclosure agreement with BryterCX.

89.   NGData's infringement of the '726 patent has been and continues to be deliberate, willful, and in violation of Ignite's rights, warranting a finding that this case is exceptional and that Ignite is entitled to an award of enhanced damages and attorneys' fees and costs pursuant to

35 U.S.C. §§ 284-285.

90.     On information and belief, NGData will continue to infringe the '726 patent unless enjoined by this Court.

91.     On information and belief, NGData is also inducing and/or has induced infringement of one or more claims of the '726 patent, including at least claim 1, by among other activities, instructing, encouraging, and directing its customers on the use of the Lily System in an infringing manner in violation of 35 U.S.C. § 271(b).

92.     NGData provides its customers with detailed explanations, instructions, and information on how to use and implement the Lily System, which demonstrate active steps taken to encourage direct infringement.

93.     On information and belief, as set forth above, NGData has had knowledge of the '726 patent since before the filing of this Complaint, and also as of the filing of this Complaint. Despite this knowledge, NGData has continued to engage in activities to encourage and assist its customers in the use of the Lily System. NGData had actual knowledge of the '726 patent, knowingly induced its customers to infringe the '726 patent, and had specific intent to induce the patent infringement.

94.     On information and belief, by using the Lily System as encouraged and assisted by NGData, NGData's customers have directly infringed and continue to directly infringe one or more claims of the '726 patent, including at least claim 1. On information and belief, NGData knew or was willfully blind to the fact that its actions would induce its customers to directly infringe the '726 patent.

95.     As a result of NGData's infringement of the '726 patent, Ignite has suffered monetary damages, and seeks recovery, in an amount to be proven at trial, adequate to compensate

for NGData's infringement, but in no event less than a reasonable royalty, with interest and costs.

96.     NGData's continued infringement of the '726 patent will continue to damage Ignite, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

## Count V: Infringement of U.S. Patent No. 7,644,134

97.     Ignite hereby alleges and incorporates by reference each of the preceding paragraphs of the Complaint as though fully set forth herein.

98.     On information and belief, NGData has directly infringed and continues to directly infringe one or more claims of the '134 patent, including at least claim 1 of the '134 patent, in the state of Delaware, in this judicial district, and elsewhere in the United States by, among other things, using, selling, and offering for sale products and services that embody one or more of the inventions claimed in the '134 patent, including but not limited to the Lily System.

99.     The Lily System includes a "computer implemented method," as described above, for "analyzing user interaction with a system," such as a merchant's website, customer CRM systems, apps, etc.

100.    The Lily System collects user data based on "user interaction" on a website or other systems.

101.    Users can interact with a system, for example, a website, to access different webpages or "a plurality of states."

102.    The Lily System comprises a real-time processing architecture that is capable of analyzing user interaction on different webpages, which can then be analyzed from tracking user access on the webpages, which can be in a sequence or "predefined task." The Lily System knows that a user will navigate through different pages of a website, such that the first sequence is pre-

analyzed and pre-defined.   For example, when a user accesses a webpage having a "Sports" section, the user may navigate to the "Football" subsection or the "Olympics" subsection.

103.     The Lily System tracks user interaction data on the website and uses this "user session data" to understand and analyze user behavior.   The Lily System can access all of the session data on the website and use it to generate real-time metrics.



104.     The Lily System accesses the session data and uses that to compare with another interaction of the user for understanding user behavior and further analysis.   In doing so, a pattern matching algorithm may be used, with the help of machine learning.



105.    The Lily System can calculate the propensity and preference score of the sequence, or "compare the second sequence of user accesses in the suer session data to the first sequence of user accesses in the first task to determine whether at least a portion of the first task was performed by the first user."



106.    As the Lily System compares the user interaction data on different occasions, it may determine the differences between the user access interaction to further understand the behavior, which may be used to determine if a portion of the sequence was performed by that user.

107.    The Lily System provides feedback data, including "recommendations" to improve the website, based on the user-based interaction with the website.



108.    The Lily System provides "recommendations" for website personalization, or "altering one or more of the plurality of states of the system."



109.   By using, selling, and offering the Lily System in the United States NGData has injured Ignite and is liable to Ignite for directly infringing, either literally or under the doctrine of equivalents, one or more claims of the '134 patent, including, without limitation, claim 1 pursuant to 35 U.S.C. § 271(a).

110.   On information and belief, NGData has had knowledge of the '134 patent prior to the filing of this Complaint, as of the date NGData entered into a nondisclosure agreement with BryterCX.

111.   NGData's infringement of the '134 patent has been and continues to be deliberate, willful, and in violation of Ignite's rights, warranting a finding that this case is exceptional and that Ignite is entitled to an award of enhanced damages and attorneys' fees and costs pursuant to 35 U.S.C. §§ 284-285.

112.   On information and belief, NGData will continue to infringe the '134 patent unless enjoined by this Court.

113.   On information and belief, NGData is also inducing and/or has induced infringement of one or more claims of the '134 patent, including at least claim 1, by among other activities, instructing, encouraging, and directing its customers on the use of the Lily System in an infringing manner in violation of 35 U.S.C. § 271(b).

114.   NGData provides its customers with detailed explanations, instructions, and information on how to use and implement the Lily System, which demonstrate active steps taken to encourage direct infringement.

115.   On information and belief, as set forth above, NGData has had knowledge of the '134 patent since before the filing of this Complaint, and also as of the filing of this Complaint.

Despite this knowledge, NGData has continued to engage in activities to encourage and assist its customers in the use of the Lily System. NGData had actual knowledge of the '134 patent, knowingly induced its customers to infringe the '134 patent, and had specific intent to induce the patent infringement.

116.    On information and belief, by using the Lily System as encouraged and assisted by NGData, NGData's customers have directly infringed and continue to directly infringe one or more claims of the '134 patent, including at least claim 1. On information and belief, NGData knew or was willfully blind to the fact that its actions would induce its customers to directly infringe the '134 patent.

117.    As a result of NGData's infringement of the '134 patent, Ignite has suffered monetary damages, and seeks recovery, in an amount to be proven at trial, adequate to compensate for NGData's infringement, but in no event less than a reasonable royalty, with interest and costs.

118.    NGData's continued infringement of the '134 patent will continue to damage Ignite, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

## Count VI: Infringement of U.S. Patent No. 7,673,340

119.    Ignite hereby alleges and incorporates by reference each of the preceding paragraphs of the Complaint as though fully set forth herein.

120.    On information and belief, NGData has directly infringed and continues to directly infringe one or more claims of the '340 patent, including at least claim 2 of the '340 patent, in the state of Delaware, in this judicial district, and elsewhere in the United States by, among other things, using, selling, and offering for sale products and services that embody one or more of the inventions claimed in the '340 patent, including but not limited to the Lily System.

121.    The Lily System includes a "method for analyzing user behavior of an interactive system," as described above, such as a merchant's website, customer CRM systems, apps, etc.

122.    The "structure" or features of the website are analyzed through machine learning. For example, The Lily System's "Customer DNA" analyzes website structural data for monitoring customer-based interactions.



123.    The personalization of a website using the Lily System is based on different representations or "states" of the website, that the Lily System creates.  One representation is a "presentation model," such as particular tabs and menus, and another representation is an "application model," such as a subscription renewal service.



124.   Based on the data from various representations, the Lily System creates metrics,

graphics, or "snapshots" for presentation-specific features and application-specific features.



125.    The Lily System's "Listen Layer" has all data through various channels, or "log data representing user activity" that is stored in the "Big Data Repository."   The data is then processed in the "Learn Layer."

126.    The Lily System "creates a report on user activity of the interactive system," which includes "recommendations to improve the interactive system based on the user activity."



127.    By using, selling, and offering the Lily System in the United States NGData has injured Ignite and is liable to Ignite for directly infringing, either literally or under the doctrine of equivalents, one or more claims of the '340 patent, including, without limitation, claim 2 pursuant to 35 U.S.C. § 271(a).

128.    On information and belief, NGData has had knowledge of the '340 patent prior to the filing of this Complaint, as of the date NGData entered into a nondisclosure agreement with BryterCX.

129.    NGData's infringement of the '340 patent has been and continues to be deliberate,

willful, and in violation of Ignite's rights, warranting a finding that this case is exceptional and that Ignite is entitled to an award of enhanced damages and attorneys' fees and costs pursuant to 35 U.S.C. §§ 284-285.

130.    On information and belief, NGData will continue to infringe the '340 patent unless enjoined by this Court.

131.    On information and belief, NGData is also inducing and/or has induced infringement of one or more claims of the '340 patent, including at least claim 2, by among other activities, instructing, encouraging, and directing its customers on the use of the Lily System in an infringing manner in violation of 35 U.S.C. § 271(b).

132.    NGData provides its customers with detailed explanations, instructions, and information on how to use and implement the Lily System, which demonstrate active steps taken to encourage direct infringement.

133.    On information and belief, as set forth above, NGData has had knowledge of the '340 patent since before the filing of this Complaint, and also as of the filing of this Complaint. Despite this knowledge, NGData has continued to engage in activities to encourage and assist its customers in the use of the Lily System. NGData had actual knowledge of the '340 patent, knowingly induced its customers to infringe the '340 patent, and had specific intent to induce the patent infringement.

134.    On information and belief, by using the Lily System as encouraged and assisted by NGData, NGData's customers have directly infringed and continue to directly infringe one or more claims of the '340 patent, including at least claim 2. On information and belief, NGData knew or was willfully blind to the fact that its actions would induce its customers to directly infringe the '340 patent.

135.    As a result of NGData's infringement of the '340 patent, Ignite has suffered monetary damages, and seeks recovery, in an amount to be proven at trial, adequate to compensate for NGData's infringement, but in no event less than a reasonable royalty, with interest and costs.

136.    NGData's continued infringement of the '340 patent will continue to damage Ignite, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

## REQUEST FOR PERMANENT INJUNCTIVE RELIEF

137.    Ignite hereby alleges and incorporates by reference each of the preceding paragraphs of the Complaint as though fully set forth herein.

138.    Unless NGData is enjoined from engaging in additional misconduct, Ignite will be irreparably harmed in the marketplace by having its trade secrets improperly, unlawfully, and competitively used against it, and by NGData's continued willful infringement of Ignite's patent rights. Such misconduct has resulted in irreparable harm already, and will result in ongoing irreparable harm absent an injunction.

139.    Ignite has no adequate remedy at law for NGData's misconduct, as money damages are not adequate to compensate for the ongoing harm caused by its misconduct.

140.    Ignite has a clear legal right to the requested relief.

141.    The public interest favors entry of an injunction to uphold the importance of trade secret preservation and patent protection and to protect the legitimate business interests of trade secret owners and patentees.

## DEMAND FOR JURY TRIAL

Ignite hereby demands a trial by jury of any and all issues triable before a jury.

## <u>REQUEST FOR RELIEF</u>

Pursuant to the allegations and claims asserted herein, Ignite requests the following:

A.    An order permanently requiring that NGData be prohibited from using any Ignite trade secrets and from selling services or other products based thereon;

B.    A judgment that NGData has infringed one or more claims of the Patents-in-Suit;

C.    A judgment awarding Ignite its actual, consequential and other damages allowable by law, including any unjust enrichment obtained by NGData, as well as exemplary damages as provided for under the DTSA and DUTSA;

D.    A judgment awarding Ignite its actual, consequential and other damages allowable by law, including any lost profits obtained by NGData, as well as exemplary damages for tortious interference with existing contract;

E.    A judgment awarding Ignite damages adequate to compensate for NGData's patent infringement, but in no event less than a reasonable royalty;

F.    A judgment and order finding that NGData's patent infringement is willful and awarding Ignite enhanced damages pursuant to 35 U.S.C. § 284;

G.    A judgment awarding Ignite its reasonable and necessary attorneys' fees incurred in, and related to, this action;

H.    Pre- and post-judgment interest at the highest rate allowable by law;

I.    Costs of court; and

J.    All such further and additional relief to which it may be entitled.

/s/ Travis S. Hunter
Travis S. Hunter (#5350)
Katharine L. Mowery (#5629)
OF COUNSEL:                            Puja A. Upadhyay (#7125)
                                       RICHARDS, LAYTON & FINGER, P.A.
Conor M. Civins                        920 N. King Street
Michael Chibib                         Wilmington, DE  19801
BRACEWELL LLP                          (302) 651-7700
111 Congress Ave. Suite 2300           hunter@rlf.com
Austin, Texas 78701                    mowery@rlf.com
(512) 472-7800                         upadhyay@rlf.com
conor.civins@bracewell.com
michael.chibib@bracewell.com           *Attorneys for Plaintiffs Ignite Enterprise
                                       Software Solutions, LLC and IgniteTech CX
                                       Solutions, LLC*

Dated: October 24, 2023