# Exhibit B

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IGNITE ENTERPRISE SOFTWARE Solutions, LLC, *et al.*, | ) | Case No. 1:23-cv-01209-JFM |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Courtroom 3B |
| v. | ) | U.S. Courthouse |
| | ) | 601 Market Street |
| NGData, US INC., *et al.*, | ) | Philadelphia, PA 19106 |
| | ) | |
| Defendants. | ) | |
| | ) | December 17, 2024 |
| | ) | 9:35 a.m. |

TRANSCRIPT OF MARKMAN HEARING
BEFORE HONORABLE JOHN F. MURPHY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiffs:        Richards, Layton & Finger, PA
                           By: KATHARINE LESTER MOWERY, ESQ.
                           One Rodney Square
                           Suite 600
                           920 N. King Street
                           Wilmington, DE 19801

                           Bracewell LLP
                           By:  CONOR M. CIVINS, ESQ.
                                MICHAEL CHIBIB, ESQ.
                                CHRISTOPHER MIERZEJEWSKI, ESQ.
                           111 Congress Ave
                           Suite 2300
                           Austin, TX 78701-4061

ESR Operator/Deputy Clerk:  Kenny Duvak

TRANSCRIPTION SERVICE:      **TRANSCRIPTS PLUS, INC.**
                           435 Riverview Circle
                           New Hope, PA 18938
                           Telephone:  215-862-1115
                           e-mail CourtTranscripts@aol.com


Proceedings recorded by electronic sound recording, transcript
Produced by transcription service.

2

APPEARANCES:
(continued)

For the Defendants:                    Fish & Richardson, P.C.
                                       By:  WARREN K. MABEY, JR., ESQ.
                                       222 Delaware Avenue, 17th Floor
                                       P.O. Box 1114
                                       Wilmington, DE 19899-1114

                                       Fish & Richardson, P.C.
                                       By:  BRET T. WINTERLE, ESQ.
                                            MICHAEL A. VINCENT, ESQ.
                                            BRANDON AVERS, ESQ.
                                       1717 Main Street, Suite 5000
                                       Dallas, TX 75201

                                       - - -

3

INDEX

|                   | PAGE |
|-------------------|------|
| Markman Hearing   | 6    |
| Motion to Compel  | 113  |

4

1          THE CLERK:  All rise.  The United States District

2    Court for the Eastern District of Pennsylvania is now in

3    session.  The Honorable John F. Murphy is presiding.

4          THE COURT:  Good morning, everyone.

5          MULTIPLE SPEAKERS:  Good morning, Your Honor.

6          THE COURT:  Have a seat, please.

7                    (Pause)

8          THE COURT:  Okay, all right.  So, we are here for

9    Ignite versus NGData, that's 23-cv-1209 in the District of

10   Delaware.

11         Let's have introductions, please, starting with the

12   plaintiff.

13         MS. MOWERY:  Good afternoon, Your Honor.  Kate Mowery

14   from Richards, Layton & Finger on behalf of plaintiffs.  Nice

15   to see you again this morning; thank you for having us in

16   Philly.

17         I'm here today with my co-counsel from Bracewell, Mr.

18   Mike Chibib, Chris Mierzejewski, and Conor Civins.

19         Mr. Chibib and Mierzejewski will be handling the

20   Markman, and Mr. Civins will be addressing the discovery

21   dispute.

22         And I did place slides with Your Honor and your law

23   clerk.

24         THE COURT:  These ones?

25         MS. MOWERY:  Yes.

5

 1          THE COURT:  Okay.

 2          MS. MOWERY:  Thank you.

 3          MR. MABEY:  Good morning, Your Honor.  Warren Mabey

 4  from Fish & Richardson on behalf of the NGData defendants.

 5  With me today are some of my colleagues from Fish & Richardson,

 6  Bret Winterle, Michael Vincent, and Brandon Avers, who will be,

 7  today, making his first argument as an admitted attorney.

 8          THE COURT:  Wonderful.  That's excellent.  Glad to

 9  hear it.

10          Okay.  So, I assume you all already have a plan for

11  how to run through these things.  So, I will -- I'm happy to

12  defer to you.  If you don't have a plan, you -- we can make

13  one.

14          MS. MOWERY:  Yeah, I think, Your Honor, we were

15  going to defer to Your Honor's wishes on order, if you have

16  one.

17          THE COURT:  I'd be just as -- I'd be perfectly happy

18  to take it as it's all laid out in the brief.  Just go straight

19  through, issue-by-issue, if that's okay with everyone else.

20          MR. MABEY:  That's fine, Your Honor.  I didn't know

21  if -- you had ask us to file a reply on the discovery issues.

22  I didn't know if that was something you --

23          THE COURT:  Oh, do you want to do the discovery at

24  the end, maybe?

25          MR. MABEY:  Sure.

1          THE COURT:  Yeah, while I'm -- let's do the <u>Markman</u>

2    while I'm fresh, and we'll do discovery at the end, if that's

3    okay.

4          MR. MABEY:  Certainly.

5          MR. CHABIB:  Your Honor, if it's all right,

6    plaintiffs are going to go.  We'll go turn-by-turn.

7          THE COURT:  I think that makes sense.

8          MR. CHABIB:  Okay.

9          THE COURT:  And -- oh, one thing before it slips my

10    mind, could someone email chambers a Word version of the joint

11    brief?  Because I'm going to just use that as a template for

12    the order, because it's got all the -- it's got all the nice

13    formatting and everything in it, so it will save me a lot of

14    time.

15          MS. MOWERY:  We will do that, Your Honor.

16          THE COURT:  Thanks.

17          MR. CHABIB:  Can we switch it over to plaintiffs'

18    video?  Thank you.

19                (Pause/Off-the-record colloquy)

20          MR. CHABIB:  Good morning, Your Honor; I'm sorry.

21    Mike Chabib of Bracewell on behalf of the Ignite plaintiffs.

22          Your Honor, before we jumped into the terms, I just

23    wanted to give one slide worth of background on the technology;

24    I know Your Honor is somewhat familiar with it already.

25          So, this -- these patents, they're all related to

7

1 similar technology, and they're all directed toward owners and

2 operators of interactive systems or websites.

3        And so these patents talk about, and are directed to,

4 the notion of analyzing a system or website; analyzing the

5 behavior of visitors to that website; comparing it to what the

6 owner or operator would have expected the visitor to do.  And

7 to the extent that there are differences, making

8 recommendations about changing the structure of the website so

9 that future users would have an easier time operating the

10 system or website.  That's essentially what we're talking about

11 for all of the terms today.

12        Next slide, please.

13        The first term is "Session Data," and this is in the

14 '134 patents.  So the first few terms are '134 patents.

15        Defendants, NGData, have proposed "data representing

16 a user's sequential navigation through a [system/website]."

17 Plaintiffs have proposed no construction necessary.

18 Alternatively, "data representing a user's navigation through a

19 system."

20        Importantly here, and this was in all of the

21 briefing, this is one of the themes of today's hearing is

22 defendants want to insert the notion of "sequence" or

23 "sequential" into these claim terms, into the meaning of the

24 claim terms, where plaintiffs feel like that's improper.

25        Next slide, please.

8

1          THE COURT:  Can you give me some -- because I noticed
2    the same thing, that that was -- it came up multiple times.
3    Can you give me some color with respect to how it affects --
4    it's likely to affect the flow of this case, whether the
5    sequential requirement gets brought into a lot of these claim
6    terms or it doesn't?

7          MR. CHABIB:  Yes, Your Honor.  Well, on behalf of
8    plaintiffs, we're not exactly sure what defendants intend to
9    argue as far as non-infringement goes.  But I presume that it
10   creates for them at least some colorable non-infringement
11   argument.

12         On our side, we think that, you know, certainly for
13   the terms that they're trying to inject it into, that these are
14   pretty well-known terms that don't have that element to them,
15   that limitation to them.  So, we think it certainly allows our
16   infringement arguments to proceed.  I don't know exactly what
17   defendants intend to argue.

18         THE COURT:  Is there something about -- I don't --
19   this whole space, software products like this, I don't -- it's
20   not something I've ever used or ever thought about before this
21   case.  Is there something to the notion that the data, or
22   depending on the claim term, would be sequential in nature or
23   not sequential in nature?  Does that seem to have any
24   reflection on the -- on significant differentiators in this
25   type of software?

9

1          MR. CHABIB:  I can't imagine that it does, Your

2    Honor.  I think that the notion that when you add "sequence,"

3    you're requiring the infringing system to follow a certain

4    path.  And I guess, you know, certainly with websites and

5    things, as Your Honor knows, people hop around from path to

6    path to path, and it's not necessarily one path that they're

7    following.  And that's all we're trying to prevent from

8    happening in these constructions, is the notion that a user has

9    to follow a certain path in order to meet the claims of the

10   patents.

11         THE COURT:  Okay; go ahead.

12         MR. CHABIB:  So, as -- here on Slide 4, "session

13   data" is actually defined in the patent.  You can see here in

14   the patent in Column 16 that "session data" is defined as

15   "Visit and Visitor Statistics."  So, this is where we get the

16   basis for our definition.  And this is where -- plaintiffs'

17   position is obviously, within those words, there is no sequence

18   limitation included.

19         THE COURT:  So, this came up a couple times, too.

20   Putting -- putting something in parentheses after a term is

21   definitional?

22         MR. CHABIB:  Yes, Your Honor, it can be, and

23   certainly is informative of the intended meaning by the

24   patentee.

25         THE COURT:  Okay; go ahead.

10

1          MR. CHABIB:   Okay.   So, as we said before, "visit and

2     visitor statistics" is what "session data" is defined as.   And

3     Table 4 of the patent, which is in Column 15, further

4     delineates what are visitor [sic] and visit [sic] statistics.

5     So, you can see here on Slide 5, "visitor" is the identity of

6     the visitor, such as the IP address, cookies, etc., the

7     geography of the user, repeat or single visitors, etc.

8          And same with "visit."   It's page views, page hits,

9     click-ins, and the like.

10          So, each one of these identified data points or data

11     structures in this table are considered session data, or is

12     considered session data.   And while there may be sequence

13     information included in session data, it's certainly not

14     required.   And as you can see just from the listing here on

15     Table 4, not all of those relate to sequence at all.

16          On the next slide is further reason why we don't

17     believe sequence should be included, because of the -- the

18     express claim language of the claim.   So, this here is from

19     Claim 1, and as you can tell, when the patentee wanted to

20     include the notion of sequence in the claim, the patentee

21     expressly put it in there.

22          So, there's two references to sequence, or multiple

23     references, I'm sorry, to sequence in this claim.   And the LSI

24     Industries case tells us that it's -- it warns against that in

25     grafting the limitation into the term itself when it appears

1  elsewhere in the claims.  So, I've provided that cite there,

2  Your Honor.

3          But here, it's clear that where sequence is required,

4  it is expressly recited.  And we brief that on, I believe,

5  Page 8 of the claim construction brief, Docket 140.

6          THE COURT:  Now, the word "session data" includes the

7  word -- the phrase "session data" includes the word "session,"

8  and session also has a definition, right?

9          MR. CHABIB:  Yes, Your Honor.

10         THE COURT:  And that has sequence in it, right?

11         MR. CHABIB:  Yes, Your Honor, that's correct.

12         THE COURT:  So, how do you deal with that?

13         MR. CHABIB:  Well, a session comprises many things.

14  It does comprise a sequence, but it also comprises other data.

15  And so, when the term "session" is used to modify data, it can

16  mean any number of types of data that formulate what becomes of

17  a session.

18         So, a session is a visitor's sequence of accessing

19  web pages or links in the system.

20         Session data is many different things, like who is

21  the visitor; where are they visiting from; what pages do they

22  go to?  That number of things.

23         So, again, session data is part of a session.

24         THE COURT:  Okay.

25         MR. CHABIB:  Next slide, please.

1           On Slide 7, what we're showing here is one of the

2    main reasons why sequence should not be included in session

3    data.  As I showed you in the last slide, Claim 1 expressly

4    called out for sequence information in the claim language

5    itself.  Claim 19 doesn't do that.  This is also an independent

6    claim.

7           So, here, "session data" is used by the patentee

8    without any reference to sequence.  So, if we were to define

9    session data as including sequence, it would limit Claim 19

10   unnecessarily.

11          And, Your Honor, that's all I have on "session data."

12   And --

13          THE COURT:  Okay.

14          MR. CHABIB:  And with that, I'll pass to the

15   defendants' counsel.

16          THE COURT:  Okay.

17          MR. WINTERLE:  May I approach to give you and your

18   clerk a copy?

19          THE COURT:  Yeah.  Yeah.

20                          (Pause)

21          THE COURT:  Thanks.

22          MR. WINTERLE:  So, may it please the Court.  I guess

23   I'd like to start with going back to what Mr. Chibib said about

24   what this technology is.  He talked about comparing what you

25   see happen to what was expected to happen.  What did a visitor

13

1   to the site do as compared to what did you expect then to

2   happen?  And use that comparison to improve the website, right?

3   Maybe make it a little more efficient.  If you're finding

4   people are going through, you know, five steps to get to the

5   same spot, maybe you can put a link to that spot on the first

6   page and make it easier for them.  And all these patents seem

7   to be basically about that concept; I tend to agree with Mr.

8   Chabib.

9           So, how does one compare what you expected to happen

10  in what a user did on the website versus what actually happened

11  if you don't know the sequence of events that the user did?

12  And that's why these patents talk about forming a session,

13  right?  Using the log data to come up with the session.  And

14  the session has session data that's about the session.  It

15  explains -- now, some of it is certainly identifying the user

16  and things like that.

17          But if you don't have the information that shows the

18  user's sequential navigation through the system or site, you

19  don't have anything to compare.  That's the whole thrust of

20  these patents, is to compare what the user did versus what you

21  expected them to do as they navigated through the website.

22          We'll go to the next slide.

23          So, you know, here we see -- you know, these are just

24  the claims themselves.  And we made the point in our briefing

25  that we feel like it is -- the claim language itself, in both

1  Claim 1 and Claim 19, requires this sequential navigation

2  aspect.

3         First off, the session data has to be representative

4  of a session.  It's not just something that's part of a

5  session, or something that is associated with a session.  It

6  has to be representative of a session.

7         And as Your Honor noted, a session, the patents

8  define, as sequential in nature.  So for something to be

9  representative of something that is sequential in nature, we

10 think the data must be -- must represent the sequential

11 navigation of that session.

12        Now, the -- Mr. Chabib noted these -- use of the word

13 "sequence" in Claim 1.  There you see a second sequence, and

14 you see a -- there's a first sequence, as well.  And, you know,

15 here, you're determining differences between the user session

16 data and the first task.  And if you look at the patent, I

17 mean, "task" is defined also.  And task is basically, like,

18 what the operator of the website wanted somebody to be able to

19 do, right?  How do I get somebody to the purchase screen, or

20 something like that, dah, dah, dah, dah.

21        And so how do you compare the differences if you

22 don't know from the session data what they did?  What is the

23 sequence of things that they did?  And in Claim 19, while it

24 doesn't use the word "sequence," again, the session data must

25 be representative of the session.

1    And then you're looking at these tasks again,

2  whether, you know, whether the -- the task is a sequential list

3  of items, okay.  So, how do you compare whether you use a

4  pattern-matching algorithm to compare whether you did any part

5  of that sequence of events if you don't know what the sequence

6  of events are from the session data.

7    Go to the next slide.

8    So, you know, they pointed to this portion of the

9  specification and, I guess, admitted that the part in the

10  parentheses was definitional in nature.  But then, you know,

11  they don't want to look at the other parts of the patent where

12  they talk about, okay, what is the visit then?  If a session

13  data is -- includes the visit, well, the visit, Table 1, is a

14  sequence of pages that a unique visitor visited without a large

15  time gap.

16    So, you're creating this session that had -- you

17  know, session data about this session.  You're trying to figure

18  out, okay, what did a user do in a small amount of time on the

19  site to figure out what -- you know, how did that interaction

20  work out, and how did it -- and then you can compare it.

21    And then at Column 6, Lines 48 through 50, they

22  define again, you know, what is a session.  And a session is a

23  visit to the site.  Again, visit.  It's a sequence of pages.

24  For example, Page 1, Page 2, Page 3, Page 4, sequential.

25    And then during prosecution of the patent -- go to

1  the next slide -- this is what they told the Patent Office.

2  "Session data represents sequences of states (i.e., web pages)

3  visited by users."  It could not be more clear that this is

4  what was intended.  This is what they told the Patent Office

5  the session data was.

6        And it's not us trying to read something into these

7  claims, it's not us trying to add a limitation that's there.

8  It's them trying to strip something that is integral and part

9  and parcel of the purported invention out of this so that they

10  can -- and Your Honor asked, okay, well, what's the import?

11  I'm not going to hide the ball.  We will file a motion for

12  summary judgment of non-infringement for claims with the

13  sequential allegation -- sequential aspect.

14        THE COURT:  Well, I assume your client makes some

15  software that analyzes websites and website traffic data,

16  something like that?

17        MR. WINTERLE:  Sort of.

18        THE COURT:  Okay.

19        MR. WINTERLE:  I mean, they -- they get --

20        THE COURT:  Well, how does it work if you don't

21  ingest, and process, or analyze data that has the sequences of

22  user interaction in it?

23        MR. WINTERLE:  Well, I will gladly explain that to

24  Your Honor in a forthcoming paper.  But it basically is more

25  focused on what did a single user's overall interactions with a

1  company do, right?  Have they come to your site multiple times?

2  What are they searching for?  So that if that user comes again,

3  you can provide some information that's going to be of use to

4  that user, right?

5          Like a particular advertisement for something.  Or

6  maybe that user is somebody that the bank or some customer

7  should call to talk about, you know, "Hey, would you be

8  interested in opening a home equity line of credit?"  Because

9  you've seen that that user has explored the website multiple

10 times looking at home equity lines of credit; those sorts of

11 things.

12          THE COURT:  Is there anything in the patent that

13 would shed light, either in favor of your position or against

14 it, on the question of whether when if -- if the session data,

15 if it is representative of or it represents the session, which

16 has sequential information in it, if you're representing that

17 data, or to use the visitor definition, I guess -- what's the

18 word?  Statistics.  If you're generating statistics about a

19 session, why would something representative of a session or

20 including statistics about a session necessarily also have to

21 be sequential?  Couldn't you --

22          MR. WINTERLE:  Because --

23          THE COURT:  Couldn't you represent or generate

24 statistics about sequential information, and not have that be

25 sequential?

18

1    MR. WINTERLE:  I think maybe in the abstract.  But

2  the problem is if you're going to be doing the things that

3  these claims talk about doing, where you're doing these

4  comparisons, and pattern-matching, and things like that, you

5  need to know, did they -- did they do that?

6    THE COURT:  Well, so does the patent tell me one way

7  or the other what it means to represent some data, or generate

8  statistics on data, and how -- and what that would involve or

9  include?

10    MR. WINTERLE:  I'm trying -- I don't recall in the

11  '134 patent if it does.  I think the '340 patent, which has a

12  different term, has the session entries thing.  But it -- it --

13  it talks about creating a session, right?  It's, again, using

14  sort of log data about visitors' interactions to formulate a

15  session, and that uses the term "session entries."  And it has

16  some more description, I'm recalling, about sort of how that

17  process is done, that I don't actually think is described with

18  any sort of great detail in the '134 patent.  I'm sure Mr.

19  Chabib can correct that if I'm mistaken on that.

20    But in terms of, you know, what does it mean to be

21  "representative of a session?"  Well, I mean, if a session is

22  this sequential or sequence of pages, I just don't see how you

23  can have the session data not be -- represent the sequential

24  navigation through a site, or a system, whatever the term may

25  be.

 1                THE COURT:  Okay.

 2                MR. WINTERLE:  Next slide.

 3                Make sure I'm not -- no, so, unless Your Honor has

 4    any other questions about that, I will --

 5                THE COURT:  Okay, that's good.

 6                MR. WINTERLE:  And if you -- actually, Michael, can

 7    you go back up the slide that had the two claims?  Yeah.  No --

 8    yep.

 9                So, Claim 19, you know, it's basically, you know, a

10    set -- a part of this claim that's not highlighted here.  It's,

11    I guess, the fourth step, this identifying anomalies.

12                Again, a task is something that the website operator

13    defined as a sequence of things, right, that a user had to do.

14    I just don't understand how you're going to identify any sort

15    of anomaly between a task and the session data if the session

16    data doesn't have the sequential aspect.

17                THE COURT:  Okay, got it.

18                MR. CHABIB:  Your Honor, may I make one further

19    comment?

20                THE COURT:  Sure.

21                MR. CHABIB:  If Your Honor would just look at Slide 5

22    in plaintiffs' slides.

23                Again, "session data" was defined as "visit and

24    visitor statistics."  Your Honor picked up on that.  If you

25    look at the title of the table, these are "Available Insight

20

1   Data" for comparisons.  So, again, yes, the claims call for

2   comparisons, but look at all of these various types of session

3   data that can be compared, not all of which has any sequential

4   information whatsoever.

5           And, again, when the patentee wanted to inject a

6   sequential element into the claims, he used terms like

7   "sequence," or "task," and the like.  When the patentee wanted

8   to not inject sequence and used terms like "session data,"

9   which, as you can see here on this slide, includes many more

10  things other than sequence.

11          Thank you.

12          THE COURT:  Okay.  And then you can keep going.

13          MR. CHABIB:  Yes.  Thank you, Your Honor.

14          The next term is "future users," again, from the '134

15  patent.  Plaintiffs argue that no construction is necessary.

16  Defendants argue that it should be "Users other than the

17  first/prior user[s]."

18          Again, this is plain English.  We feel like a

19  layperson would understand the terminology here and no

20  construction is necessary.  And we also think that defendants'

21  proposed construction injects what we call a negative claim

22  limitation that is not found anywhere in the specification.

23          The only difference between a first user and future

24  users is time.  And that is set forth specifically in Table 1

25  of the patent in Column 4.

1          Next slide, please.

2          So, as we can see here, this is Claim 1.  Claim 1

3    compares the first user's interaction with a defined task of

4    the system.  Then, as I mentioned, if there are differences, it

5    makes recommendations to change the system for future users.

6          THE COURT:  And this user -- I know this is -- it

7    comes up later.  But this user is the customer, the person

8    who's going to the website to use the website for whatever its

9    purpose is, not the person using the analytical software.

10         MR. CHABIB:  You're exactly correct.

11         THE COURT:  Okay.

12         MR. CHABIB:  Yes.

13         So, the first user's interaction is a visitor to the

14   website does some things.  It's compared to what the operator

15   or analyst thinks should have happened.  And when there are

16   differences noted, if they're significant enough, it makes

17   recommendations that would then alter the state or change the

18   structure of the website or system.

19         But it allows a first user's interaction to generate

20   changes to benefit future users.  Again, any future user is

21   going to benefit from the first user's interaction with the

22   system.

23         THE COURT:  So, that was a question I had about this

24   one.  The first user is significant in the claim because

25   there's discussion about where this data is coming from.  It's

1  coming from the first user's interaction.  Okay, so now that's,

2  I understand, the purpose of talking about a first user.

3          At the very end, when it talks about the future

4  users, it's in this clause "to assist future users in

5  performing the first task."  When thinking about how this claim

6  would be infringed, nobody cares about whether there is a

7  future user or who the future users are.  It's totally

8  irrelevant, right?  Because this "to assist future users" is

9  just describing the purpose or the functions, I suppose, of

10 that last step, right?  Like, the effect of the last step.

11         MR. CHABIB:  I believe that's fair, Your Honor.

12 Obviously, there has to be a future user.  You can't just shut

13 down the website, so to speak, after the changes are made.

14 But, yes, it is functional in that it has to benefit future

15 users, or at least in the minds of the operator or analyst.

16         THE COURT:  Right.  So, that's why -- I guess -- and

17 that was the second question I had is, plaintiffs propose no

18 construction necessary.  But I heard you say something that I

19 had written down to ask you about, which is, consistent with

20 your view, would it be any future user?

21         MR. CHABIB:  It would be any future user.

22         THE COURT:  Okay.

23         MR. CHABIB:  Yes.

24         THE COURT:  All right, okay.

25         MR. CHABIB:  Okay.  So, again, that's Claim 1.

1   Nothing says -- nothing in here, there's no express limitation

2   in the claim itself that says wherein future users are not a

3   first user, right?  There's nothing that tells us that.

4          Next slide, please.

5          Claim 19, the same thing.  Exact, you know, same

6   steps and no express recitation that the first user cannot also

7   be a future user.

8          Next slide.

9          And we also know that the specification in the patent

10  is not -- does not say that this negative limitation needs to

11  apply, right?  In order for a negative limitation to apply,

12  there needs to be something very clear in the patent

13  specification that tells us that.  And, here, the specification

14  contemplates the notion of unique visitors or repeat visitors.

15  So, it's certainly in the mind of the patentee that one visitor

16  can come back multiple times as a repeat visitor.  So, we think

17  that that's actually directly counter to defendants' proposed

18  construction.

19         And that's, again, all we have for "future user,"

20  Your Honor.

21         THE COURT:  Okay.

22         MR. AVERS:  May it please the Court.  Your Honor, I

23  think it's important to frame this dispute.  Over the course of

24  the briefing, the actual issue that we disagreed on narrowed

25  quite considerably.  The issue we're really arguing about here

1  is whether future users represent some class of future users,

2  plural, or, instead, can be limited to a single future user.

3       So off the base -- could we get our slides up on the

4  screen?  Could we have our slides put up on the screen?  Thank

5  you.

6            (Pause/Off-the-record colloquy)

7       MR. AVERS:  So, just a few basic claim construction

8  issues here.  "Future users" is plural.  The Federal Circuit

9  tells us that when we have a plural term, we assume or presume

10 that it's referring to at least two things.

11       Here, the thing is users.  So we're assuming that

12 this website or this system needs to be improved for at least

13 two future people.

14       Could we advance to the next slide?

15       We've already seen the claim language.  We see

16 "future users," plural, in both of these claims.

17       Now, you mentioned -- and this might just be the

18 purpose, or you asked whether or not this is almost a tagalong

19 at the end talking about the function of the claim.  But I

20 think it might be a little bit more than that.

21       There are some systems where you could think of that

22 might be personalized or tailored.  It might be improving a

23 system for one individual, right?  Creating almost a customized

24 experience for one person.  So there are certain systems where

25 this actually might be a limitation that could distinguish

1  between those two ideas.

2        In this particular case, and kind of the scope of

3  these patents, we are analyzing the paths that certain users

4  take through these systems, comparing them to the anticipated

5  or intended path that we'd like them to, and identifying

6  inefficiencies.  Once we've found those, we're trying to

7  improve the entire system for all the individuals who come to

8  the website later, or the system later.

9        If we advance to the next slide, I have a quote from

10  a Federal Circuit case.  The 's' at the end of "future users,"

11  making it plural, was added intentionally.  Now, there was some

12  back and forth in the briefing over whether or not this was a

13  necessary change that needed to be made in order to avoid some

14  previous prior art or in order to get the claim allowed.  But

15  the Federal Circuit here is telling us that there's no

16  principle of patent law that the scope of a surrender of

17  subject matter during prosecution is limited to what's

18  necessary.  Right?  The fact that the claim language changed,

19  and they added an "s" -- if we advance to the next slide,

20  you'll see that it changed from "future user" in both of these

21  claims to "future users."  So we added in this "s."

22        So, regardless of the reason why it changed -- and

23  it's not super clear in the prosecution history.  There's lots

24  of changes happening in these claims, but they did, in fact,

25  add this "s" intentionally.

26

1          THE COURT:  Well, they also changed it from an

2   adjective to a noun.

3          MR. AVERS:  Right.  I see what you're saying.

4          But even still, we now have this new noun, "future

5   users," that's been added to the claim.  So, you've at least

6   change it from describing what's happening, which could apply

7   to one individual user, and now it's mandating at least that we

8   have "future users," plural.

9          And if we advance two slides, I'd like to address

10  this idea of repeat users.  We agree, repeat users can be a

11  part of that future class.  To be sure, people often revisit

12  the same website over and over again, whether it be to get news

13  or recheck your emails.  So, we understand that the present

14  user, the first user, the current user could come back and be a

15  future user.

16         But this idea of repeat users is coming up in the

17  specification, referring to a particular kind of future user,

18  almost a subclass.  We're never talking about one individual

19  future user, we're talking about a bunch of future users who

20  happen to be repetitive users.

21         If you look up at the very top of this paragraph,

22  preceding one that Ignite quoted in its brief, you'll see that

23  it's talking about a report that can focus on a particular

24  group or population of visitors.  Repeat visitors is just one

25  kind of population or group within that future user group.

1              THE COURT:  Okay.

2              MR. AVERS:  If Your Honor has no further questions --

3              THE COURT:  I got it.

4              MR. AVERS:  Thank you.

5              THE COURT:  Thank you.

6              MR. CHABIB:  Your Honor, the only thing I'll add on

7    the users -- the "future user" [sic] claim term is just that

8    the plain -- plain English tells us -- the words of the claim

9    tell us "future users."  There's no limitation on who a future

10   user can or has to be.  It can be any future user.  It could be

11   the same user multiple times.  There's just -- there's no

12   limitation anywhere in the patent, in the claim language, that

13   tells us otherwise.

14             THE COURT:  I'm a little fuzzy on how, if you are

15   analyzing a Q software package, how you could tell who the

16   improvements were for, just looking at the software.  I'm not

17   even sure how the --

18             MR. CHABIB:  Well, do you need to identify who?

19             THE COURT:  I don't know.

20             MR. CHABIB:  I mean, I -- it just -- it's -- and it's

21   also based on the idea of the owner and analyst, what's an

22   actual improvement.

23             THE COURT:  Okay.

24             MR. CHABIB:  Okay.  The next term, Your Honor, is on

25   Slide 12.

28

1            "Altering one or more of the plurality of states of

2  the system."  Defendants have proposed that this term is

3  indefinite.  They have not offered an alternative construction.

4  We believe that no construction is necessary, but

5  alternatively, that it should be defined as "changing one or

6  more of the plurality of states of the system to facilitate

7  task performance by future users," and then subsequently also

8  for the web pages on Claim 19.

9            So, again, we've already talked about this, the --

10  what these claims do, and what the systems do, they identify

11  differences, and then they make recommendations and changes to

12  the structure of the website or system.  And that's the whole

13  purpose, to better facilitate tasks for people that come

14  afterward.

15            THE COURT:  Is there -- is -- sorry.

16            MR. CHABIB:  Yeah.

17            THE COURT:  Is there anything in your construction

18  that is significant, or is it just sort of --

19            MR. CHABIB:  It's just different --

20            THE COURT:  -- a little light use of the thesaurus?

21            MR. CHABIB:  Yeah, I apologize.

22            THE COURT:  Okay.

23            MR. CHABIB:  Yes, Your Honor.  We don't think

24  construction is necessary.

25            THE COURT:  All right.

29

 1          MR. CHABIB:  It makes perfect sense, yeah.

 2          THE COURT:  All right.

 3          MR. CHABIB:  Okay.  Next slide, please.

 4          Slide 13, okay.  So, what changes are made to the

 5  system or website?  Well, the specification tells us right

 6  here, Column 17, Lines 22 through 29, talks about anomalies

 7  being detected, and depending on the severity of those

 8  anomalies, it makes -- the invention makes recommendations.

 9          The recommendations might be to, one, add a link to

10  the start of the task, or to a page more frequently visited

11  than the current referring page to promote a link to the next

12  step in the task, etc., etc.

13          So, again, defendants claim indefinite.  They claim

14  that a person of ordinary skill in the art would not understand

15  what altering the states of the state machine or the website

16  means when we have this expressly here in the specification.

17          Next slide, please.

18          And not only does the specification tell us what

19  changes are made to help us understand and help a person of

20  skill in the art understand, but it also tells us why the

21  changes are made.  As we've talked about multiple times, this

22  is from our brief at Page 15, but it tells us that the

23  "discoveries can be used to alter the website structure to

24  better facilitate visitor tasks."  Again, this is straight from

25  the patent, multiple citations there on this Slide 14.

1          And the key -- again, Your Honor, the question that

2    is being asked at the Court with respect to this term is

3    defendants say it's indefinite.  We say no construction is

4    necessary, and that a person of ordinary skill in the art would

5    understand this term by looking at the intrinsic evidence.

6          THE COURT:  Can you explain to me what, in the

7    context of at least this claim phrase, if not perhaps a more

8    universal definition for these patents, what is a "state?"

9          MR. CHABIB:  Well, a state is one instance of a

10   greater whole.  So, a system is modeled by what's called a

11   state machine.  And a state machine comprises states, which are

12   in the instance of a website, it's a web page.

13         THE COURT:  Okay, so one --

14         MR. CHABIB:  And --

15         THE COURT:  In this context, often -- maybe not

16   always, but often, a state is a web page?

17         MR. CHABIB:  Yes.

18         THE COURT:  That's what I was --

19         MR. CHABIB:  And it's the structure of that.  Yes,

20   Your Honor.

21         THE COURT:  -- kind of picking up.

22         MR. CHABIB:  Yep, so the states, and then there are

23   links between states.

24         THE COURT:  Okay.

25         MR. CHABIB:  That's the state machine.  It's the

31

1  states and the links.

2         THE COURT:  Okay.  And is this like -- well, you go

3  ahead.

4         MR. CHABIB:  No, I'm actually finished with this

5  term, Your Honor.

6         THE COURT:  Okay.

7         MR. CHABIB:  If you have any other questions, I'm

8  happy to answer them.

9         THE COURT:  No.  I can hear from defendant.

10        MR. CHABIB:  Thank you.

11        MR. VINCENT:  Good morning, Your Honor.  Michael

12  Vincent for the defendants.

13        So the dispute here focuses on whether a person of

14  ordinary skill could reasonably identify what it means to alter

15  a plurality of states.  And that phrase is important because

16  we're not talking about altering structure or links.  We're

17  talking about states.  That is the operative limitation of the

18  claim here.

19        And we know this is important, this distinction is

20  important because the patent tells us.

21        The next slide, you'll see that the claim itself

22  introduces two elements highlighted here, "A plurality of

23  states linked by a navigation structure."

24        So the drafter deemed these two elements important

25  enough to include separately in the claim.  And, of course, we

32

1    know that different terms in a claim are presumed to have

2    different meanings, especially so when they're right next to

3    each other.  It wouldn't make sense to conflate these, as we

4    think is, unfortunately, being done here, because they're

5    listed separately right next to each other.

6          THE COURT:  When -- I understood that argument from

7    your briefing, and maybe it was because of the -- just the

8    word, the connection in my brain between states, the abstract

9    concept we're dealing here, and states like, you know, the

10   United States of America.  But I -- the thought popped into my

11   head thinking about, well, the states, meaning Pennsylvania and

12   other states, the states are linked by a navigation structure;

13   I don't know, highways, whatever it might be.  But the

14   navigation structure is also part of the states.

15         So, it's not crazy to say, again, on a very general

16   level, and I know you're going to bring me back to the patent,

17   and that's fine.  But at a very general level, to say that the

18   states are linked by a navigation structure, that doesn't

19   necessarily mean the navigation structure is not part of the

20   states.

21         And, in fact, on a web page, the links are in the

22   page, right?

23         MR. VINCENT:  That's true.  I mean, they're closely

24   related terms, but they are separate.  So, we need to figure

25   out where the dividing line is.  Because all that we're seeing

33

1  in plaintiffs' presentation and plaintiffs' brief is a

2  discussion about the navigation structure.

3          So, if you'll look at the next slide.  Unfortunately,

4  I think the parties are talking past each other a little bit

5  here.  In the briefing and today, Ignite has missed the

6  distinction that we're trying to make here, that states and

7  structure are different things.  Everything that Ignite

8  provides as examples are talking about structure, including

9  today on Slides 13 and 14.  Ignite -- the paragraph that it

10  cites, talks a lot about changing the structure.  And we're

11  talking about changing the state.  We're trying to interpret

12  what the actual claim limitation means.  It says "altering the

13  states," not "altering the structure" here.

14          And I understand why that may be the case.  It's hard

15  to blame them because there's very little in the patent about

16  what it means to alter a state.  The patent is all about

17  changing links and structure, but we have to give life to the

18  words that the drafter chose in the claim itself, and it talked

19  about altering states, not altering structure.

20          So, if the drafter had intended for a mere change in

21  link to satisfy the altering of plurality of states limitation,

22  it could have just as easily said instead generating a

23  recommendation for altering the navigation structure.  Because

24  that term's already in the patent -- or already in the claim up

25  at the top.  But they didn't, they said altering the state.

34

1    And so we need to understand what that means.

2            On the next slide, I've excerpted, again, a sentence

3    from Ignite's brief here where, remarkably, they waver back and

4    forth between the structure and the state term.  So, to alter

5    the structure, you alter the web pages, which is a type of

6    state here.

7            And below, you'll see that the specification echoes

8    what the claim tells us, that these are separate concepts.  So,

9    the nodes and pages are in the state category here.  And then

10   the hyperlinking that Ignite is talking about is an example of

11   a link or an edge.

12           And so the specification emphasizes, again, that the

13   alleged invention here conceived of these as separate yet

14   related concepts here.  And so for Ignite to say that in order

15   to alter the structure, you alter the web page, or to alter the

16   structure, you alter the state, it just doesn't follow, because

17   they're different things.  Certainly they're related, but we

18   know they're different because the claim is telling us they

19   have a distinct scope here.

20           THE COURT:  Help me put a fine point on the

21   indefiniteness argument.  What is -- so, the claim says

22   "altering one or more of the plurality of states."  What is a

23   thing or concept that it's indefinite whether it would or would

24   not fit within that claim phrase?

25           MR. VINCENT:  Well, it's really tough to say because

1  we don't have any guidance as to what it means to alter a

2  state, separate and apart from altering the structure.  So, the

3  -- all the examples that Ignite pointed to in the spec and

4  provided in their briefing, for example on Slide 33 here,

5  they're talking about altering the structure.  And then they

6  say that to alter the structure, that would necessarily be an

7  alteration to the state, if I understand their argument

8  correctly.

9       But then that begs the question why did the claim

10 require an alteration to the state and not simply an alteration

11 to the structure?  They called out that word specifically, the

12 state -- the state feature, and yet provided no backup in the

13 specification for us to understand what that means.  So, a

14 person of --

15      THE COURT:  So, for indefiniteness, right, the

16 standard is that the skilled artisan has to be able to be

17 reasonably certain as to what falls within the scope of the

18 claim and what doesn't.  And it's -- I don't know if it's a

19 requirement, but it's very, very helpful to be able to say,

20 well, here's what we're talking about.  Here is something, a

21 concept, a structure, whatever is relevant, here's a thing that

22 a person of skill wouldn't be able to tell whether it's inside

23 the claim or not inside the claim.

24      So can you help focus me on what -- you know,

25 something really clear where I can see the indefiniteness

36

1 argument?

2       MR. VINCENT:  Well, to take Ignite's example here,

3 you have a link on a web page here.  And so a person of

4 ordinary skill looking at that, if you just change the link on

5 the web page, that would certainly be a change to the

6 structure.

7       But you're reading the claim here, and then it calls

8 out you need to change the state, not just the structure.  And

9 so tweaking a web page in that sense where you change a link on

10 a page, I'm left guessing whether that qualifies as altering

11 the state as well as the structure, or that's merely a

12 structural change.  I would argue that --

13       THE COURT:  Okay.

14       MR. VINCENT:  -- that seems to be just a navigational

15 structure change, and it -- it leaves you guessing as to, you

16 know, what further alteration you need to change the state.

17 So, that --

18       THE COURT:  Okay.

19       MR. VINCENT:  That's why --

20       THE COURT:  That helps.

21       MR. VINCENT:  Yeah, and so if -- if the -- one

22 example could be that if the link looks a little different but

23 goes to a different place, that might be changing it up.  But,

24 again, the patent doesn't really give concrete examples of

25 something like that.

37

1              So, again, it's speculation, and that's a dangerous

2    game to play when you're trying to, you know, determine the

3    metes and the bounds of a claim.

4              THE COURT:  Okay.

5              MR. VINCENT:  Thank you.

6              MR. CHABIB:  Can we get plaintiffs' slides, please?

7    If you wouldn't mind going to Slide 13, please.

8              Your Honor, we believe that the navigational

9    structure is part of the state.  So, modification to the

10   navigational structure is a modification to the state.

11   However, you --

12             THE COURT:  Is it because links are part of a web

13   page?

14             MR. CHABIB:  Yes, Your Honor.

15             THE COURT:  Okay.

16             MR. CHABIB:  And also -- but there's -- there's

17   additional reasons why.  You could -- you could certainly

18   modify a state without modifying the navigational structure.

19             THE COURT:  Right.

20             MR. CHABIB:  If -- if, for example, a link says,

21   check out/shopping cart, right, the link says shopping cart,

22   and for some reason users weren't interpreting that to mean

23   going to the shopping cart, you could change the title of that.

24   You could call it home, and they would click on it, and make it

25   more feasible for them to navigate the system.

38

1        You can highlight things -- and this slide tells us,

2  promote a link to the next step in a task.  Promote can mean

3  any number of things.  You can promote it by making it a larger

4  font; you can center it; you can put it in the middle with a

5  big red button.  But there are ways to -- to modify a state or

6  a web page without modifying the navigational structure.

7        Okay, we'll go to the next term.  Slide 15, please.

8  Thank you.

9        Your Honor, I think the parties are in agreement on

10  this.  There is one small distinction that plaintiffs are

11  unsure of.  You see in the highlighted here, we have this

12  notion of touch-tone keypad in our proposed construction that

13  is absent from defendants' proposed -- or modified proposed

14  construction.  And I just -- I'm not sure if that was

15  intentional or -- I didn't see anything in the briefing on

16  that, but we believe touch-tone keypad would be in there,

17  obviously, for an interactive voice response system, but we'll

18  turn it over to defendants to see if there's a reason.

19        MR. AVERS:  Your Honor, plaintiffs say that no

20  construction is necessary, but we believe one is.  First, we

21  think the average juror is not going to know what an

22  interactive voice response system is.  Even if they have used

23  one, they're not going to be familiar with the terminology.

24        And, second, based on some of the things we have gone

25  back and forth on in this case, it leads us to believe that if

1  we leave this term undefined, even if we're only excluding the

2  plain meaning that we would otherwise give to the jurors, I

3  think that would help focus the case as we move forward and

4  keep the sand from shifting a little bit.

5         As to the reason why we excluded this phrase here,

6  the "touch-tone keypad," it was just -- if we advance to the

7  next slide, I'll show you the actual claim language.  It says,

8  "wherein the states are voice response prompts."  That seems

9  to, itself, exclude the possibility of a touch-tone keypad if

10  you're supposed to respond to the prompt.  That's the only

11  reason we excluded it.

12         Other than that, I don't have anything else to add.

13         THE COURT:  So, the alternative language that's being

14  discussed, it ends in the phrase, "such as through a phone

15  using voice recognition."  And then plaintiff would add "and a

16  touch-tone keypad."  But it's already exemplary.  You're not

17  proposing that the claim should -- it doesn't sound like you're

18  proposing the claim should exclude a touch-tone keypad.

19         MR. AVERS:  The term --

20         THE COURT:  You just don't want it as one -- as the -

21  - in the "such as" clause?

22         MR. AVERS:  Yeah, I guess just -- I don't necessarily

23  believe it's excluded from the term itself.  I just think to

24  make it make sense in the context of this claim, maybe the

25  examples would be adding a little bit of unnecessary confusion,

40

1   given that the dependent claim itself goes on to limit that

2   particular aspect.

3            THE COURT:  Okay.  Got it.

4            MR. AVERS:  Thank you, Your Honor.

5            THE COURT:  Okay.

6            MR. CHABIB:  Your Honor, if it's --

7            THE COURT:  Oh, is this -- is the touch-tone keypad

8   evidence?  Is it just this bit of extrinsic evidence, is that

9   where you're getting that from?

10           MR. CHABIB:  Yes, Your Honor.

11           THE COURT:  Okay.

12           MR. CHABIB:  Yeah.

13           THE COURT:  That's --

14           MR. CHABIB:  And, again, if -- if it's not meant to

15  be expressly excluded, then I'm not really sure it matters.

16           THE COURT:  Yeah, okay.

17           MR. CHABIB:  The next term on Slide 16 is "the nth

18  link provided by the common referring page" [sic].  Defendants,

19  again, claim that this is indefinite and do not offer a

20  competing construction.

21           Plaintiffs say, "No construction necessary.

22  Alternatively: a placeholder position in the sequence of links

23  from the common referring page."

24           So, the argument that defendants make in the briefing

25  on this indefiniteness is that the scope of the claim is

41

1  unclear or indefinite because one can count the links in

2  multiple different ways.  And this is on Page 21 of the <u>Markman</u>

3  brief of Docket 140, Your Honor.  That's their position.

4       Next slide, please.

5       So, as we said in our response to that on Page 24 of

6  the brief, the value of "n" or how the links are counted, how

7  it's calculated, is irrelevant to the actual scope of the

8  claim.  All that matters is that the number of links be

9  countable.  If you can count them in any different way, the nth

10  link is just that.  It's irrelevant.  It doesn't broaden the

11  claim by saying I can count it six different ways, and it

12  doesn't narrow the claim by saying I can only count it one way.

13  And the value of "n" is also irrelevant.  The manner of

14  counting is irrelevant.

15       If we look at the underlined quote here or the -- not

16  quote, but the underlined brief, it says, "An infringing system

17  either provides an option to define a task based on the nth

18  link or it doesn't."  Right?  It doesn't -- it's not a scope

19  question.  It's simply, is it countable at all?

20       Next slide, please.

21       And then Claim 31 tells us -- the specification tells

22  us that Claim 31 is directed to this more generic way for

23  performing a task, right?  The "specification for a task step

24  can also be done in a more generic way."  So they're defining a

25  task in a more generic way.  "The page identified by the nth

42

1    link provided in a particular referring page."

2              So, instead of saying it's the fifth link from this

3    referring page, that's how we're going to define this task

4    step.  So, you know, if you do Step 1, Step 2, and then you go

5    to the fifth link, that's the way we're going to define the

6    task.  It says we're going to do Step 1, Step 2, and then an

7    nth link, meaning any number of links away.  And that's just

8    the generic way of describing this, and this is very typical in

9    software programming.

10             So, I guess the takeaway is, Your Honor, that the

11   indefinite argument that there are various ways of counting

12   links, I think, fails because it doesn't change the scope of

13   the claim.  And that's their sole argument on the

14   indefiniteness, is that the scope is changed because there are

15   multiple ways of counting links.

16             And so with that, I'll turn it over, unless Your

17   Honor has a question.

18             THE COURT:  No.

19             MR. AVERS:  May we switch over to plaintiffs' --

20   defendants' slides?

21             Your Honor, the way in which we count to the nth

22   link, and which of those ways actually qualifies to -- as

23   defining the nth link do matter.  The claim is indefinite

24   because there are multiple ways to do so, and the specification

25   of the claims themselves don't tell us which of those ways

43

1  qualify as defining the nth link.

2          All right.  If we advance to the next slide, I'll

3  quickly just add a little bit of perspective on these claims

4  themselves and where they're coming from because Claim 31,

5  where the nth link, actually, term resides is a multiple

6  dependent claim.

7          Claim 19 recites a limitation for defining a first

8  task.  Claim 30 narrows that a little bit, and says that we're

9  going to be "defining the first task as pages of the website

10  linked from a common referring web page."  You can think of a

11  home page with a bunch of different links on it.

12          Claim 31 gets even a little bit narrower.  It says

13  we'll be "defining the first task as the page identified by the

14  nth link."

15          But nowhere in Claim 31 or any of the claims that

16  tell us the particular way that someone would go about defining

17  what the nth link is.  Because that requires counting, the

18  method of counting is actually necessary for us to know in

19  order to be able to figure out how we would define the nth

20  link.

21          If we advance to the next slide, we'll see a quote

22  from a Federal Circuit case that gives us a test for indefinite

23  calculations.  And something's indefinite when there are

24  different known methods that exist for calculating a claimed

25  parameter; nothing in the record suggests using one of those

44

1  methods in particular; and the application of the different

2  methods results in materially different outcome [sic] for the

3  claim's scope.

4          On the next slide, I've got a few example ways that

5  we have different methods for calculating the nth link.

6  These are all coming from Ignite's brief.  We could number the

7  links from top to bottom.  We could have a particular

8  implementation that would itself define and order the links in

9  any particular way.  You could imagine a web page has all the

10  links indexed alphabetically, and then numbers them in

11  alphabetical order.

12          And if you apply these different methods of applying

13  or calculating what the nth link is, you would end up with

14  different nth links.  When a POSA is reading this claim, a

15  person of ordinary skill is reading this claim, they're not

16  going to actually know which of these particular methods of

17  calculating the nth link is what the patent itself is

18  envisioning.  Which of these actually qualifies as defining

19  something as the nth link?

20          THE COURT:  Does it matter?  Because it only matters

21  that there's different ways, methods, I suppose, of applying a

22  claim term if it makes a material difference to a particular

23  issue of infringement or validity.

24          MR. AVERS:  So, I just want to make sure I understand

25  your question correctly.

1          THE COURT:  Like, if there's -- the cases you've

2    cited, if there's more than one way to measure something, or

3    more than one way to test something, more than one way to

4    assess whether a particular claim limitation is satisfied, that

5    doesn't matter unless those different ways actually yield a

6    material difference for infringement or validity.  I mean, it

7    has to matter.

8          There's always multiple ways of doing something, but

9    if it doesn't make a difference, it doesn't make the claim

10   indefinite.

11         MR. AVERS:  Right.  And so I think here, the

12   difference does kind of play in in that way.  Because depending

13   on whether or not the particular method of counting qualifies

14   as defining the nth link will change whether or not your system

15   is infringement.

16         You know, if you take a step back and think about the

17   person of ordinary skill in the art at the time this patent was

18   made, 23 years ago, websites were simple; Ignite pointed this

19   out in their brief.  You tended to have these websites that

20   ordered links vertically, you know, one, two, three, four,

21   five.  They were very easy to count.

22         So if that's the only way of defining the nth link is

23   that mental way of going top to bottom, okay, then we can

24   exclude all of these other methods.

25         But the patent doesn't actually say that.  The

46

1  specification doesn't say that, neither do the claims.  And

2  there are all these other potential ways that we could be

3  defining the nth link.  If we don't know which, and the person

4  of ordinary skill has no guidance from the patent itself, then

5  we won't actually know what the scope of this claim is.

6          THE COURT:  Okay.

7          MR. AVERS:  Thank you, Your Honor.

8          MR. CHABIB:  Your Honor, one last point on this nth

9  link.  "N" is a placeholder, it's any number.  So, you can

10  count -- if -- if it -- if the claim had said the fifth link,

11  then I think we would have something to argue about as far as

12  the definiteness goes, because we wouldn't know how to count to

13  five.  We wouldn't know which method got us to five, or -- but

14  it says "n."  "N" is any number.

15          So, if there is a link, it can be the nth link,

16  regardless of the way of counting.

17          THE COURT:  And the -- you know, I -- the limitation

18  that that claim is adding, that claim language is adding, the

19  purpose of that dependent claim is, I am assuming you say, it's

20  to distinguish from the other possible ways of defining a step

21  that are listed in Column 7 where you were showing me.

22          MR. CHABIB:  Yes, Your Honor, that's correct.

23          THE COURT:  Okay, all right.

24          MR. CHABIB:  Okay, Slide 19, please.  Thank you.

25          The next term is "exhaustive dominant task

47

1   detection." Again, defendants argue indefinite, and don't

2   provide a competing construction. We believe that no

3   construction is necessary, and alternatively, "detection of a

4   dominant task for any arbitrary page of the website."

5          Next slide, please.

6          So, as you can see, "dominant task" is defined in the

7   specification. It is the most commonly occurring tasks related

8   to a page of interest or a focal page.

9          "Detection," again, plain English. But you can see

10   in the specification, detection is likened to discovery.

11          So, all that leaves us with remaining is

12   "exhaustive."

13          So, next slide, please.

14          So, with "exhaustive," the patent tells us that the

15   number of dominant tasks is configurable by the user. So, the

16   number of top pages, the number of tasks to return, and the

17   lengths of the tasks to be displayed are chosen by the website

18   analyst.

19          So, we know that dominant -- we know what dominant

20   tasks are; they're the most commonly occurring. And we also

21   know that the analyst gets to define how many there are and how

22   long each of those dominant tasks are.

23          Next page, please.

24          And so to further the point -- that point, here, we

25   have Figure 17. And I apologize for these figures, Your Honor,

48

1  they're terrible.  But it shows us -- this is the screen that

2  the website analyst sees.  And I've highlighted there on the

3  left, you can see that's a control bar that allows the analyst

4  to select the number of dominant paths that they want to see.

5       It also has a -- below it, it says "clicks."  That's

6  how many -- that's how long the tasks can be defined as.  So,

7  here, three clicks away or three links away.

8       And so, again, we see that the controls on the left

9  allow the user to choose which of the top five dominant paths

10 for that page to display and to set the number of clicks.

11 Right?  This is Figure 17, dominant path control.

12      So, an exhaustive dominant path detection detects all

13 of those dominant tasks that are defined by the analyst.  So,

14 again, if it's five, exhaustive would be to detect all five of

15 them.  If it's 25, it would be all 25 of them, but that's

16 controllable by the user of the system or their website

17 analyst.

18      Thank you, Your Honor.

19      MR. AVERS:  Your Honor, this claim is indefinite for

20 two reasons.  There are two different things that are injecting

21 uncertainty to the meaning of the words "exhaustive dominant

22 task detection" that render a POSITA without reasonable

23 certainty as to what the boundaries of this claim are.

24      First, the claim makes some kind of irreconcilable

25 request involving the ways that we have to apply "exhaustive"

49

1   to task detection and "dominant" to task detection.

2        And, second, the specification gives the claim so

3   many subjective boundaries that a POSA wouldn't actually be

4   able to know what the limitations or the edges of this claim

5   are at unless you are talking to the exact person who has the

6   system that you're looking at.

7        So let's start with that first one.  If we advance

8   the next slide, I've got the claim up here on the screen.

9   "Exhaustive," by its plain meaning, seems to refer to all, and

10  there doesn't seem to be a dispute about that.

11       And "dominant" is defined in the specification to

12  mean the most commonly occurring.  And both of these are

13  modifying task detection.

14       If we go to the next slide, I have just a visual to

15  show you what I'm talking about.  So, dominant task detection –

16  – well, I'll start with exhaustive.  Exhaustive task detection,

17  detecting all of the tasks, right?

18       And dominant task detection is detecting a smaller

19  subset of those tasks.  So, when we have both these words,

20  modifying task detection, exhaustive has to be doing some work.

21       The dominant task detection is already looking at a

22  subclass of different tasks.  It's going to identify them all

23  by itself.  We've discussed previously, or at least Ignite

24  brought it up, that some of these user configurations allow you

25  to determine the exact number of paths that you're going to

50

1   identify.  If you've identified five paths that things should

2   detect, then it's not clear that exhaustive is doing any work.

3   And when we're looking at these claims, we need to make sure

4   that each of the terms themselves is having a role to play in

5   the way that we're applying them.  We generally shouldn't be

6   leaving any terms to be redundant.

7         THE COURT:  So, to use your librarian analogy, how do

8   you know that the claim isn't saying for the librarian to get

9   all the -- get the most popular books exhaustively?  To get all

10  of the most popular books.

11        MR. AVERS:  Well, if we advance to the next slide, we

12  can see the specification actually uses the phrase "dominant

13  task detection."  And they actually use the word "exhaustive"

14  here.  So, dominant task detection alone is already returning

15  an exhaustive list of dominant tasks.

16        So, to apply that to our analogy with the librarian,

17  the librarian -- and they're getting those most popular books,

18  that's the analog to dominant task -- is getting an exhaustive

19  list of the most popular books.  And so that secondary

20  instruction, which is to get all of the books, is then now

21  eclipsing the entire purpose of getting the most popular books.

22  You'll already have gotten those with all the books, so it's

23  not clear what this upper bound is.

24        In the briefing, Ignite actually tried to give some

25  kind of limiting principle.  It said that because of the

1  limitations of technology, a POSA would know that it doesn't

2  mean returning all of the tasks.  It has to be something less

3  than that, but that's it.

4          So our upper bound right now for exhaustive, or what

5  exhaustive is adding beyond just these most commonly occurring

6  tasks, is less than all.  And that's such an extreme boundary

7  that it's more or less no boundary at all, and it renders the

8  claim indefinite.

9          Adding to this indefiniteness, or compounding it --

10  if we advance to the next slide.  So, the specification creates

11  subjective boundaries.  And Ignite referred to some of these in

12  its briefing and argument today, but the fact that the user

13  identifies the number of top paths for each page, the number of

14  top pages for which the paths were identified, the fact that

15  these are configurable by the user is creating a blurry lower

16  boundary, too.

17          If you think about the diagram I had with the two

18  circles, you can think that that smaller inner circle, it's

19  actually not clear to us what the most commonly occurring tasks

20  are, it's a blurry boundary, because each user gets to decide

21  how big it is.  And when you add that in context with the

22  larger bigger circle, we don't actually really know what

23  exhaustive is adding to that smaller circle.  We've almost got

24  two fuzzy boundaries on both sides.  We really don't know how

25  many tasks are supposed to be getting returned.  Because a POSA

52

1  wouldn't have reasonable certainty to what these two boundaries

2  are, the claim is indefinite.

3          THE COURT:  Okay.

4          MR. AVERS:  If Your Honor has no further questions.

5          THE COURT:  No, I got it.

6          MR. AVERS:  Thank you.

7          THE COURT:  One more question for the plaintiff about

8  this before the next term.

9          MR. CHABIB:  About the next term, Your Honor?

10         THE COURT:  No, about this "exhaustive dominant."

11         MR. CHABIB:  Yes.

12         THE COURT:  So, plaintiff provided an alternative

13  construction, "detection of a dominant task for any arbitrary

14  page of the website."  But as is, you know, discussed in the

15  argument, and we've been talking about here, "exhaustive" means

16  something.  You say it means complete.  How is that captured in

17  your proposed construction, and would you -- is there a way to

18  do that?

19         MR. CHABIB:  Your Honor, I actually noticed that, as

20  well.  And I do think that -- I do think that it needs to be

21  amended, our alternative construction.  That it's -- it's the

22  detection of all dominant tasks defined by the analyst for a

23  particular page or website, all dominant tasks.

24         So -- and on that note, you know, I think that

25  defendants argued that exhaustive modifies dominant, which

53

1  modifies task detection, and I believe we put in our brief

2  also, but it's "dominant task detection."  If you look at the

3  previous slide -- or two.  One more.  I'm sorry.  Yeah,

4  "dominant task" is -- "dominant task discovery" or "dominant

5  task detection" is what's being modified by exhaustive, that's

6  what I wanted to get across.

7            THE COURT:  Okay, I got it.

8            MR. CHABIB:  Okay.  The next term -- Your Honor,

9  quite frankly, I don't think this term should have been

10 included in a dispute on claim construction, but this is the

11 dispute about "enables user definition of the [first] task."

12 And defendants claim that this is indefinite because they can't

13 tell which user we're talking about, and Your Honor hit on this

14 at the top of the hearing.

15           We think this is crystal clear.  Their position is

16 that it could be some random website visitor, as opposed to the

17 website analyst who's actually performing the method of the

18 claims.

19           So, let's go to the next slide.

20           The website analyst is the user of the claims, and we

21 see that in Claim 8 which depends from Claim 1.  So, Claim 1 is

22 a method for analyzing user interaction with a system.  So,

23 we're analyzing the visitors to a web page, for example.  Who's

24 doing that analyzing?  Well, that's the website analyst.

25           So, the step that's modified in Claim 8 is the

54

1  defining a first task.  So, defines a first task in Claim 1.

2  And then in Claim 8, it's dependent on that, and it says where

3  that step of defining a task "enables user definition of the

4  task."  And that's the user we're concerned about here with

5  this term.

6          THE COURT:  So, just to back up, in Claim 1, for

7  example, there's a phrase "user accesses," there's a phrase

8  "first user."  Those are the person using the website, right?

9          MR. CHABIB:  That is correct, Your Honor.

10         THE COURT:  Okay.  And then your position is that you

11 get to Claim 8, where it says "enables user definition of the

12 task," that user is the user of the analytical software.

13         MR. CHABIB:  Yes, Your Honor, because it --

14         THE COURT:  Okay.

15         MR. CHABIB:  It modifies the defining of first task

16 limitation.

17         THE COURT:  Okay.  Continue.

18         MR. CHABIB:  Thank you.

19         And, you know, Your Honor is already keen on the

20 distinction between the two, so I'll just go to the next slide,

21 please.

22         So, the key is, is what user is defining the task?

23 Well, the patent tells us straight away at Column 7, Lines 57

24 through 59.  "Task definition can be input by the user of the

25 software, e.g. the website designer or a website analyst."

1              So, again, who is doing the defining of the task?  It

2   is the user, it's the analyst.  And then you can also see

3   further support in the specification in the highlighted portion

4   where it says "tasks can be defined as a sequence of web pages

5   with which the host wishes or expects the visitor to view or

6   interact."  Again, the host is the owner or operator of the

7   website.

8              Next slide, please.

9              And then just to, you know, maybe beat the dead

10  horse, Figure 4 on the right of the patent, this is the screen

11  where a task is defined, right?  So, this is the claim element.

12  We're defining a task, and a user is doing it.  Well, this

13  screen is the screen from the analyst software.  It's not the

14  website -- the underlying website that a visitor will be

15  visiting.  This is what the operator or analyst looks at.  It's

16  the Task Wizard panel or the user interface for the definition

17  of a task.

18             Again, a visitor to a website doesn't see this.  They

19  don't run this software, they don't see this screen.  This is

20  only seen by the website analyst.

21             That's all I've got, Your Honor.

22             THE COURT:  Okay.

23             MR. AVERS:  Your Honor, because the claim's context

24  uses "user" to refer to the website visitor, and in contrast

25  the specification uses "user" to refer to website designers, a

1 POSA is not going to be able to figure out who the user is in

2 dependent Claims 8 and 10.

3      Twenty-four times, that's how many times the word

4 "user" shows up in independent claims in this patent, referring

5 to the website visitor.  Ignite doesn't really contest this,

6 and didn't really discuss it in their briefing.

7      But let's focus on Claim 1.  Fourteen times "user"

8 shows up referring to the website visitor.  A person of

9 ordinary skill who is reading these claims is going to start at

10 Claim 8, Claim 10, and read the first five words, "The method

11 of Claim 1," they're going to look at Claim 1, and they're

12 going to see the user there is absolutely talking about the

13 website visitor, because it has to.  It's talking about their

14 accesses.  It's talking about analyzing their interaction.

15 It's talking about their session data.  That's very clearly

16 talking about the website visitor.

17      They get to Claim 8, and the same word, "user,"

18 they're going to read that and think to themselves, "okay, like

19 terms have like meaning, surely these are the same user,"

20 especially because Claims 8 and 10 are dependent on Claim 1.

21      THE COURT:  Is there anything in the patent that

22 would suggest that the website user could define a task?

23      MR. AVERS:  Yes.  If we skip ahead two slides, you'll

24 see this highlight on top.  "The present invention provides

25 several ways to enable a visitor to define the task."  This is

1  kind of a key point where this ambiguity gets inflamed by the

2  specification.  This is the sentence immediately before what

3  Ignite actually quoted on one of their slides, "Task definition

4  can be input by the user of the software."  But the

5  specification seems to contemplate that either the visitor or

6  the user could be the one defining the tasks.  This is

7  something that either one could do, but when you get to the

8  claims, it's just talking consistently about the user, one

9  user.  There's no indication that it's both.  It's either the

10 visitor or the user when you're up in the specification.  And

11 the fact that it's just both using this word "user" is

12 injecting so much ambiguity into the claims that a person of

13 ordinary skill isn't actually going to be able to distinguish

14 between the two of them.

15        Because the term "user" is ambiguous, it could refer

16 to the visitor, as it does in the claims, or the user, or the

17 website designer, as it does up in the specification.  A person

18 of ordinary skill is going to lack reasonable certainty as to

19 what Claims 8 and 10 are referring to.

20        THE COURT:  Okay.

21        MR. AVERS:  Thank you, Your Honor.

22        THE COURT:  Let me ask the plaintiff to comment on

23 that Column 7 --

24        MR. CHABIB:  Yes, Your Honor.

25        THE COURT:  -- Line 55, that paragraph.

58

1          (Pause/Off-the-record colloquy)

2          MR. CHABIB:  Your Honor, I mean, clearly the term --

3  the word "visitor" here was a mistake in insertion.  It should

4  have clearly been the analyst, or something along those lines.

5  But it's very clear from this portion of the specification

6  that, while it says "The present invention provides several

7  ways to enable a visitor to define a task," everything that

8  follows is the analyst defining the task.  There is no way and

9  no method for a visitor to define the task.  It's clear.  And I

10 think, you know, defendants' counsel has a very dim view of a

11 person of ordinary skill in the art that they couldn't

12 determine what user is being referenced in the claim.  It's

13 plain to see that every method of defining the task is

14 performed by the website analyst, even though it does

15 incorrectly say "visitor" at the front end of this paragraph.

16         THE COURT:  Okay.

17         MR. CHABIB:  Would you mind changing back over the

18 plaintiffs' please?  Thank you.

19              (Pause/Off-the-record colloquy)

20         MR. CHABIB:  Okay.  Your Honor, the next term is

21 "state machine," and this is from the '340 patent.

22         Defendants propose that this is "A sequence of states

23 and transitions between those states."  We believe that no

24 construction is necessary or, alternatively, "a set of states

25 and transitions."  So, again, this is back to the theme of

1    whether a sequence should be inserted or not.

2            We believe the defendants are wrong because the state

3    machine is an actual structure.  It's not the manner in which

4    the structure is navigated.

5            If we'd turn to the next slide.

6            THE COURT:  Can you remind me, what are nodes and

7    transitions?

8            MR. CHABIB:  Yes, Your Honor.  So in the website

9    analogy, a node is a web page, and the transitions are links

10   between the web pages, the various web pages.

11           THE COURT:  Okay.

12           MR. CHABIB:  It's probably the easiest just to stick

13   with that.  Obviously it genericizes it sometimes.

14           And that's actually, you know, if you look at our

15   proposed construction, it's "a set of states and transitions,"

16   right?  That's essentially what that is.

17           Okay, so here are -- here, "state machine" is

18   defined, right, in the patent, the '340.  It says "state

19   machines (e.g., nodes and transitions)", right?  That's

20   definitional.

21           But we -- we illustrated some examples of state

22   machines.  And as you can see, the state machine on the right,

23   the Simon game, there's any number of sequences or steps that

24   you can take and alternate between the different and various

25   states.

60

1        Whereas, on the left, the traffic light, it's kind of

2   a one way traffic, right?  There's only one sequence.

3        Now the -- inserting "sequence" into the definition

4   of state machine is an attempt to sort of narrow the claim to

5   just cover the ones on the -- the state machine on the left, as

6   opposed to the state machine on the right.

7        This state machine is, as you can see, it is a

8   structure in and of itself, and it's still a state machine,

9   even if it's not navigated at all, right?  And so by having a

10  required sequence limitation in it, it totally takes away from

11  the actual definition of what this structure is.  It doesn't

12  have to have a sequence.

13       Next page, please.

14       And the patent has a specific example in the

15  specification of a shopping cart state machine, right?  So,

16  again, an e-commerce website.  I've illustrated an example of

17  shopping cart state machine.  This is not from the patent, just

18  random off the Internet.  But you can see the state machine has

19  many different -- on the bottom, it has many different ways

20  that you can -- you can navigate it, right?  You can

21  continually add items, you can empty your cart, you can do all

22  sorts of things; it's not just one.  And their proposed

23  construction would exclude this very specific embodiment

24  mentioned in the patent itself.

25       So, this is the state machine in and of itself,

61

1    regardless of whether a user actually even clicks on this or

2    navigates it at all.

3            One more slide, please.

4            And the specification tells us this, right?  It's

5    filled with state machines that do not require any sort of

6    sequence limitation.  So, I've given three examples here, all

7    from Column 11 of the patent, but each one of these talks about

8    the transitions, the states, but none of them -- the

9    hyperlinks, none of them talk about or mention any sequence

10   of navigation of these various embodiments of the state

11   machine.

12           And, again, their proposed construction would read

13   out all three of these embodiments, and we think that that's

14   improper.

15           So I'll turn it over.

16           THE COURT:  Okay.

17           MR. WINTERLE:  You can leave theirs up and go back

18   one slide for a second.

19                   (Pause/Off-the-record colloquy)

20           MR. WINTERLE:  So, I'll start with this.  This is not

21   a situation of us attempting to narrow anything.  This is the

22   applicant having narrowed their idea.

23           I agree, sort of, in the, sort of, abstract a state

24   machine could be like Mr. Chabib's picture down below, right?

25   Backward, forward, around, the Simon game, you name it.  But

62

1 that's not what this patent says and that's not what the

2 example is. We're not reading out any embodiments.

3 If you look at the actual text here of this example

4 that this gives, view cart, there's going to be -- you can add

5 items to cart, check out, confirm order. I mean, these are --

6 these are a sequence of things. Not -- not necessarily the

7 picture that is down below here that they've tried to explain

8 it.

9 If you'd go to our slides on this -- I'm sorry I'm

10 moving around so much. Thank you, I appreciate it.

11 All right, so -- go to the next slide.

12 All right, so the applicant here provided in the

13 specification of the patent a "herein" clause. "A sequence of

14 states and transitions between those states (also referred to

15 herein as a 'state machine')." Okay?

16 So they -- the plaintiffs do not like the fact that

17 we want to include the entire definition that was provided at

18 Column 11 of this patent, "a sequence of states and transitions

19 between those states." That's what this applicant asked a

20 state machine to be called. That's what they defined it to be

21 for the public twenty-some years ago.

22 And the Federal Circuit routinely finds that herein

23 clauses like this are definitional, and we've provided some

24 examples.

25 We can go to the next slide.

63

1        And, you know, regarding this, they made arguments

2    that we're trying to exclude embodiments that are in the

3    specification.  But, again, I don't understand how any of the

4    embodiments that are mentioned here, not really fleshed out,

5    but that are mentioned here are excluded.  I mean, the ATM

6    example specifically talks about the possible sequences of

7    things from screen to screen to screen, right?

8        So we're not reading out any of their embodiments.

9    We're just applying the actual definition that this applicant

10   gave to the public when they wrote their patent twenty-some

11   years ago.  And I don't, frankly, understand why the patent

12   owner is -- or the patentee here is so reticent to include

13   that, but that's -- it's -- it's what's in the patent.  I mean,

14   I don't --

15       If you'll go to the next slide.  This is the last one

16   on this?  Yeah.

17       So, unless Your Honor has any questions, I think this

18   is a relatively simple issue.

19       THE COURT:  Okay.  No, that's okay.

20       Well, let me hear from plaintiff on the response to

21   the definitional language at Column 11, Line 42.

22       MR. CHABIB:  Yes, Your Honor.

23       Well, I would first say that a herein clause is not

24   always definitional.  It can be definitional.  And in this

25   instance -- if we could look at plaintiffs' slides, please.

64

1          In this instance -- if you'll go to the next slide,

2   Conor.

3          Here, we have other examples of -- right after that

4   so-called supposed definitional statement, we say the patent

5   says, "state machines for the presentation model may be made up

6   of states for each unit of interaction with transitions

7   indicating possible changes to another unit of interaction."

8   No sequence is required there.

9          THE COURT:  But it doesn't -- it's true, it doesn't

10  repeat that there's a sequence.  But does it say -- does it

11  contradict the idea that there'd be a sequence?

12         MR. CHABIB:  I think it's silent to it.  But, Your

13  Honor, I would say also -- if we go to the previous slide where

14  Mr. Winterle suggested that this listing of view cart, add

15  items, check out, and confirm order is a sequence, I disagree.

16  Those are the various states and they could be hopped around in

17  any number of ways.  You don't have to go from view cart to add

18  items to check out to confirm order.

19         Again, we -- I don't believe that the herein clause

20  is definitional because there are so many different

21  descriptions of state machines in here that don't require any

22  sequence at all.

23         And, again, I go back to what would a person of

24  ordinary skill in the art understand?  The definition -- we

25  think the definition of state machine is set forth on our -- on

65

1  our Slide 28, which is nodes and transitions.  So, I mean, this

2  is just as definitional as the herein clause, and we think it's

3  pretty clear that the sequence limitation is improperly

4  imported.

5           THE COURT:  The -- I'm sorry.  One second.

6                    (Pause)

7           THE COURT:  I guess -- not to -- with the Simon

8  hypothetical, indulge me a little bit here.  Why would that not

9  be a sequence of states and transitions between those states?

10          MR. CHABIB:  Well, I think a sequence implies a

11 particular order, Your Honor.  And that's the basis for our

12 objection to the term "sequence."  Clearly, were one to

13 navigate the Simon state machine, they would be conducting a

14 sequence of states.  It would be, you know, going from one to

15 another to another.

16          But the notion that a state machine, as defined, is a

17 sequence or requires a sequence, I think is improper.  The

18 state machine is the structure itself.  It's the states and the

19 transitions between them.  It's not the way that it's

20 navigated.  It is a structure in and of itself.

21          THE COURT:  Okay.

22          MR. CHABIB:  Thank you, Your Honor.

23          With your permission, we'll go to the next term.

24          THE COURT:  Yeah.

25          MR. CHABIB:  On Slide 31.

1          THE COURT:  Sure.

2          MR. CHABIB:  "State machine snapshot."  Your Honor, I

3    think the parties are in agreement on this term.  I've shown

4    what defendants have modified their proposal to.  The --

5    obviously, the only issue here is within this definition is the

6    words "state machine," which, you know, we just went over.

7          So, I think the parties are okay regardless, but

8    "state machine" will determine the meaning of this term.

9          Unless you guys have anything to add on that, I'll

10   just go to the next term.

11         MR. WINTERLE:  I -- I do.

12         THE COURT:  But --

13         MR. CHABIB:  You do, okay.

14         MR. WINTERLE:  I wanted to --

15         MR. CHABIB:  Okay, yeah.

16         THE COURT:  I'm just looking at the brief.  Which of

17   the two proposed constructions is the agreed one?

18         MR. CHABIB:  Your Honor, we believe it's both.  On my

19   Slide 31, they're identical.  I just underlined what their new

20   language is and struck what their old language was.  So, they -

21   - it should be our alternative construction with their proposed

22   construction.

23         THE COURT:  Got it; okay.

24         MR. CHABIB:  Thank you.

25         MR. WINTERLE:  Yes, the issue is just state machine

67

1   as used herein, and I just wanted to make a point on that.

2   And that is looking at the state machine term, you know, Mr.

3   Chabib pointed to an e.g. example from the specification.  And

4   I don't have a slide up in front of me, but I believe it was

5   e.g. nodes and whatever.  An e.g. is not the same as referred

6   to herein as, and so -- and I think that the Federal Circuit

7   would agree with me that that's why in those cases, they've

8   come out that way on what does it mean when you say "referred

9   to herein."

10          And so that's important here because you have, you

11  know, okay, what is a representation of a state machine for a

12  particular range of time?  Okay, well, this indicates that a

13  state machine -- the representation of the state machine, it

14  could change.  It could be different at different points in

15  time.  And so, you're looking at your Simon example, yes, it's

16  going to have a sequence.  It might be -- have a sequence now.

17  And at a different point in time, that sequence might be a

18  different sequence.

19          And I think that's why it is important that the state

20  machine concept is sorted out, and then it's -- basically falls

21  into this construction.

22          THE COURT:  Okay, I got it.

23          MR. WINTERLE:  Thank you, Your Honor.

24          MR. CHABIB:  Your Honor, one last bit on the state

25  machine, if I may.  Just that in order for the specification to

68

1    actually define a term, it needs to be absolute and it needs to

2    be clear.

3            So, here, at minimum, we have two competing

4    definitions.  It can't be absolute, but the "herein" trumps the

5    "e.g."  That's just not the way the case law works.  There are

6    multiple instances of state machine being used without a

7    sequence, and particularly not one sequence in particular,

8    which is, I believe, what defendants are trying to import into

9    the limitation.

10           With that, I'll move on to Slide 33.

11           THE COURT:  Yeah.

12           MR. CHABIB:  The term is "a project unit adapted to

13   identify a set of the at least one state machine and the at

14   least one log entry."

15           THE COURT:  Before jumping into this one --

16           MR. CHABIB:  Yeah.

17           THE COURT:  -- and maybe this isn't the only one

18   where we have to do this.  Tell me what -- what's your view on

19   when looking at a claim in a software patent where you're using

20   a phrase like "project unit," or similar types of things, what

21   am I supposed to be looking for to determine whether it's

22   means-plus-function or not?

23           MR. CHABIB:  Yes.  Your Honor, well, first and

24   foremost, whether the term "means" is used, which in these

25   cases, it's not.  Right, so --

69

1          THE COURT:  But that's not dispositive.

2          MR. CHABIB:  No.  No, not at all.

3          THE COURT:  Okay, yeah.

4          MR. CHABIB:  It's -- it's presumptive, but it's not

5   dispositive.

6          THE COURT:  Yeah.

7          MR. CHABIB:  And then secondly, and this is what

8   defendants have argued, if the so-called unit term or nonce

9   term is modified by functional language, then it jumps you to

10  112(6), means-plus-function.

11         And our position on both of these terms, the "project

12  unit" and the "sessions unit," is that it's not modified by

13  functional language.  It's modified by structural language, and

14  that's what our presentation will be about today.

15         THE COURT:  Oh, in other words, so if it -- if it

16  said a project unit may be -- well, in the computer context,

17  this is trickier because the structure is the algorithm, is the

18  -- whatever it is that it's doing, and it's always very fuzzy

19  to me how to draw the line between whether something is

20  connoting structure or whether it's not because the structure

21  itself is what it's doing in a software patent.

22         MR. CHABIB:  I don't disagree with you at all, Your

23  Honor.  I think it's a very fuzzy world.

24         I think that here, at least with respect to project

25  unit, I think I can show you pretty clearly that a project is a

70

1  structure in and of itself.  And that's -- that's what we'd

2  like to argue.

3           THE COURT:  Okay, go ahead.

4           MR. CHABIB:  Okay.  So, I'll dispense with reading

5  the various constructions here, and we can just go on papers.

6           Next page.

7           So, what is a project, right?  So, the whole -- the

8  point here is that they say the term "unit" is being modified

9  by functional language.  Well, a project, as defined here in

10 Exhibits D, E, and F to the <u>Markman</u> brief, is a structure.

11 It's a structure for containing things.  Containing data

12 formats.  It contains data structures.

13          So, you see here at the top, Exhibit E, a "Project

14 directory-Contains files which become items in the LabVIEW

15 Project menu."

16          And then in Exhibit E -- I'm sorry, in Exhibit F,

17 managing multi-file projects.  "The project manager allows you

18 to specify the files belonging to the project."  Again,

19 structural.

20          And then on the right there, this is, I believe,

21 Microsoft saying that, "'Project' is a 'container for Visual

22 Studio source code files.'"  Again, these are the pillars of

23 technology here.  It's Microsoft National Instruments and

24 Borland defining project as something that contains files or a

25 structure.

71

1      And then if we go to the next slide, not only is that

2  the commonly understood definition of a project, but it's also

3  in the patent itself.  The patent uses the term "project" very

4  consistently with this definition.  As you can see here in

5  Column 14, "A project also acts as an organizing container,

6  like a filing cabinet, for other data related to the project,

7  such as task definitions, report templates, and reports."  All

8  of those things go into a project.  So a project has structure.

9  It is these various data structures and within the filing

10 cabinet, if you will.

11      And then there are two other examples here from

12 Column 22.  Container and -- contains a set of report

13 templates, reports, task templates, etc.  So, remember, their

14 position -- their entire position is that "unit" is modified by

15 functional language.  And the only word modifying "unit" here

16 is project.  And project is, in and of itself, structure.

17      And so if we go to the next slide, here's the project

18 unit from Figure 6.  It has multiple components.  It has a

19 project definition panel.  It has a project manager.  And it

20 has a project.  This is all within the unit.

21      And so as we talked about, the project is structure.

22 There certainly may be functions performed by other aspects of

23 the project unit, but -- the project's unit, but the project

24 unit is structural in nature.

25      So with that, I'll turn it over.

72

1            THE COURT:  And before you launch in, why don't you

2     give me your view on the same question I asked?  What's --

3     what's the methodology for resolving these disputes?

4            MR. WINTERLE:  Yeah, so I think you hit the nail on

5     the head, that there's a -- there's a line, right?  And it's a

6     little fuzzy.  Where is this line?  And my understanding of the

7     case law and software patents is there needs to be something

8     more than just defining the functions, certainly.  And it needs

9     to define enough structure within the intrinsic evidence, not a

10    bunch of things and dictionary definitions, and -- or expert

11    evidence.  The WSOU case that we cited from the Federal Circuit

12    said that, you know, bringing in this extrinsic evidence, that

13    doesn't do it.  You can't have extrinsic evidence fill in for

14    what was missing in the intrinsic record of the patent.

15           The intrinsic record of this patent, the

16    specification, needs to describe the structure for performing

17    the function.  And, yes, this -- we're -- we're not here -- we

18    have to rebut the presumption against because we're not using

19    means here.  And so we're using a unit, and we view this as a

20    functional limitation, right?  This -- this store -- it's a

21    project unit, right?

22           And the specification here, the only thing in the

23    specification about, okay, well, what is the project unit?  And

24    you can go to the, you know, so -- originally, you know, when

25    we -- when we were doing this, we identified this term.  We,

73

1   you know, said what our issue was.  You know, they didn't

2   actually identify a structure, right?  They said, well, as you

3   see the intrinsic evidence.  And I understand why they did

4   that, because if you look at this patent, it's really thin on,

5   okay, what is the project unit?

6           And you can go to the next slide.

7           I believe it shows -- let's see.  So, "project unit,"

8   okay?  So, there's the function.  It's going to identify a set

9   of the state machine, at least one log entry, and you can

10  substitute in, you know, a means, right?  It's a means to

11  identify a set of at least one state machine and log entry.  I

12  mean, this suggests to us that we have -- the presumption

13  against 112(6) should be overcome here because the project

14  unit, certainly as it's depicted and shown in this patent, as

15  we'll see, is not something that is some ordinary functional

16  thing that -- that was known.

17          And if you go to the next slide.

18          And it's certainly not in the intrinsic -- next

19  slide.  So --

20          THE COURT:  But it wasn't -- it's not a word that was

21  just made up for the claims.  It is in a figure.  It's a chunk

22  of software, right?

23          MR. WINTERLE:  Yes, it is -- it is a chunk of

24  software.  I believe, it's -- is it figure --

25          THE COURT:  The one counsel was just showing?

74

1          MR. WINTERLE:  Go to -- go to the next slide.  I

2  think it's -- got it, right?  Yeah.

3          THE COURT:  Yeah.

4          MR. WINTERLE:  Figure 6.  So, the "projects unit" in

5  Figure 6, you have this project unit that has three parts in

6  it, right?  You have a project definition panel, the project,

7  and the project manager.

8          And then, you know, there's really not a lot of

9  description in this patent about, okay, what are those things,

10  right?  It's shockingly little.  I mean, I believe this patent

11  is something like 80 columns deep of text.  And there's very

12  little description of what is this and how does this work?

13  What is the algorithm that one uses to perform the claimed

14  function of "identify[ing] a set of the at least one state

15  machine and at least one log entry"?  It's not provided in the

16  intrinsic record of this patent.

17          So, where is that dividing line?  Where is this fuzzy

18  line?  I certainly think it is in front of this claim

19  limitation.  This is -- this is not enough to give the person

20  of skill in the art notice.  It's not -- it's not, you know --

21  there's no algorithm here on how to do it.  There's no

22  description on how to do it.  The description of these things

23  is very, very thin.

24          And then, you know, we'll have another term that

25  we've also argued is 112(6).  There is more description there,

75

1    right?  And I think we noted this for you in our briefing.  You

2    know, you may disagree with me.  I think the dividing line --

3    where is this fuzzy dividing line?  I think it is ahead of both

4    of these terms.  You might think, well, actually, no, I

5    disagree with you.  I think it's between these two terms,

6    right?  There's -- there's not enough description for the

7    "project unit."  There is enough description for the "sessions

8    unit," which admittedly there is -- there's quite a bit more

9    description of the "sessions unit," and what it does, and how

10   it does it, and some options, right?

11            But, you know, I want to, again, stress to the Court,

12   these terms appear in all the same claims.  And so if you think

13   that -- if you agree with us that there is not enough structure

14   here for this "projects unit" term, the claims are done.  All

15   these claims are done, and this "sessions unit" term that's --

16   and this is not all the claims, right?  This -- I think this is

17   something like a third of the claims asserted in this

18   particular patent.

19            If you agree with us on the "projects unit" term, you

20   moot the issue on the other one, as well, and don't even

21   actually have to get into that.

22            So -- but certainly that fuzzy dividing line is

23   somewhere ahead of this -- of this claim term.  There's just --

24   there's just not enough there.  This is too thin.

25            THE COURT:  Okay.  So, I had a -- well, I had -- I'm

1  sorry, go ahead.  Keep going.

2          MR. WINTERLE:  No, I -- unless Your Honor has

3  questions, I'm --

4          THE COURT:  No, I'm good.

5          MR. WINTERLE:  I'll sit down.

6          THE COURT:  I had a follow-up question for the

7  plaintiff.

8          MR. WINTERLE:  Sure.  Thank you, Your Honor.

9          THE COURT:  So, a question for the -- a follow-up

10  question for the plaintiff is, if I were to agree with

11  defendant that it's means-plus-function, the corresponding

12  structure that you've suggested is voluminous.  Is there

13  something you want me to focus on?

14          MR. CHABIB:  Well, yes, Your Honor.

15          If we could go back -- well, let's just stay here.

16  The structure would be the project as defined in the -- in the

17  patent itself.

18          THE COURT:  And which of the various -- I'm looking

19  at Page 45 of the brief, it's five lines of citations.  Which

20  ones are -- which ones are the good ones?

21          MR. CHABIB:  Okay.

22          THE COURT:  I just -- I've never --

23          MR. CHABIB:  So --

24          THE COURT:  I've never seen a means-plus-function

25  structure definition with that in much spec cited.

77

1          MR. CHABIB:  Go back one, please.

2          THE COURT:  That's a lot.

3          MR. CHABIB:  So, Your Honor, here, the project's

4    defined on Slide 35 at Column 14, Lines 9 through 13; Column

5    22, 46 through 49; and Column 22, 60 through 63.

6          Also, I wanted to just rebut the notion that there's

7    no intrinsic evidence for the structure of this term or it --

8    for the structure of project, and I'm looking at it right now

9    on Slide 35.  Yes, we have external extrinsic evidence that

10   tells us what project means, but we also have the patent using

11   it exactly in the same manner.  This is the intrinsic evidence,

12   and this is structure.  The project is a structure.  It is not

13   functional language defining this term "unit."

14         And I'll leave it with that, Your Honor, and go on to

15   the next term, if that's all right.

16         THE COURT:  Yeah, that's fine.

17         MR. CHABIB:  Slide 37.

18         And, again, so, Your Honor, we have changed our

19   definition to match defendants' proposed construction as

20   written in this Slide 37.  So, we don't believe that there is

21   any issue anymore, but I'll let defendants, if they want to say

22   something about "session entries."

23         THE COURT:  Sure.  Are we okay with defendants'

24   proposed --

25         MR. CHABIB:  This is --

78

```
 1            THE COURT:  -- construction, or do we need to hear
 2   about it?
 3            MR. CHABIB:  This is new.  Yeah, this is -- since the
 4   briefing, this is as of today.
 5            MR. WINTERLE:  We have, obviously, nothing to say
 6   then, Your Honor.
 7            Thank you.
 8            THE COURT:  All right, very good.
 9            MR. WINTERLE:  So, thank you.
10            THE COURT:  Yeah.
11                         (Laughter)
12            THE COURT:  Well, you know, I mean, sometimes -- you
13   never know.  In the spirit of doing the opposite of what the
14   other side does, you could quick change your mind.
15            MR. CHABIB:  I've thrown them off.
16                         (Laughter)
17            MR. CHABIB:  Okay, the next term is "presentation
18   model."  Okay, "presentation model," the defendants, again,
19   claim indefinite, and don't offer an alternative construction.
20            We don't believe construction is necessary, but if
21   so, a "model representing the user interface of a system."
22            Next slide, please.
23            So, a model, Your Honor, is just a state machine
24   that's used to explain a system's behavior, right?  So, we
25   model things using a state machine so that we can understand
```

1  how they operate and how they operate when certain steps are

2  taken.

3           In this case, the patent is really clear that the

4  presentation model is the model or state machine for the user

5  interface.  And so I'm looking at two cites here --

6           THE COURT:  It's a subset of state machine?  It's a

7  type of state machine?

8           MR. CHABIB:  It's -- it is a state machine, first.

9  And it's -- the presentation model is the state machine for the

10 user interface.  Okay?  So, you'll see that the patent often

11 talks about having two state machines:  One to define the user

12 interface, and one to define the application logic.

13          And actually that first set -- that first citation

14 here, Your Honor, says that.

15          THE COURT:  Is there some --

16          MR. CHABIB:  So, it says --

17          THE COURT:  Well, it's -- what you just said is that

18 it's the state machine for the user interface is not exactly

19 what you've proposed as your proposed construction if one were

20 given.  But could it be?

21          MR. CHABIB:  No, it -- it -- it is, Your Honor.  So,

22 a model is a state machine, right?  So, it represents the user

23 interface.  It's not the user interface.  It's a state machine

24 that represents it.  It models it.

25          THE COURT:  Okay.  Represent, okay.

80

1          MR. CHABIB:  Yeah.  I'm sorry if I was unclear on

2     that.

3          THE COURT:  I got you.

4          MR. CHABIB:  Slide 39.

5          Again, the overview of this is, again, we're trying

6     to model this system or website.  So "Typically, the system

7     modeling unit 312 refers to the user interface 139 of the

8     subject system as the presentation model."  Okay, that's one

9     model.  That's the user interface model, which is the

10    presentation model.

11         And then it says, "and the application logic 136 and

12    data of the subject system is referred to as the application

13    model."  Okay?  So, those are sort of the two primary types of

14    models that are being implemented in this invention.

15         But the point I'm trying to make here is that the

16    presentation model is very clearly defined as the one that

17    represents the user interface.

18         And then the second citation says the same thing,

19    such that the presentation model represents the user interface.

20    I think it's pretty clear.  It says so in other places, but

21    that's the only ones I've shown.

22         Next slide, please.

23         So, you know, they're just saying that the term is

24    indefinite.  So, you know, the question is, is -- would a

25    person of ordinary skill in the art understand what the

81

1  presentation model is based on this intrinsic evidence?

2         And you see here Figure 36 on the right-hand side,

3  and this is exactly what I was just talking about earlier,

4  which is, you know, there are typically two models or state

5  machines used to model the system, right?  There's -- and you

6  see in Step 3603, "represent the subject system as one or more

7  state machines, one being a presentation model, and optionally

8  one being an application model."  Okay.

9         So, the presentation model is the one for the user

10 interface.  The application model is the one for the

11 application software.

12        And, again, you see the citation on the left-hand

13 side in Column 11 here.  It tells us "state machines for the

14 presentation model can be made up of states for each unit of

15 interaction.  For example, the page, the screen, the display,

16 etc."  So, again, those are all user interface instances.

17        So, again, a person of ordinary skill in the art

18 would know the presentation model represents the user

19 interface, and they would know to model things such as the

20 page, the screen, the display, etc.

21        And that's all I have on "presentation model," Your

22 Honor.

23        THE COURT:  Okay.

24            (Pause/Off-the-record colloquy)

25        MR. WINTERLE:  So, the issue, you know -- so, we

82

1  propose this is indefinite, and the reason being because it is

2  confusing in this patent to what there is, if any, difference

3  between these things based on the various points they say.  You

4  know, we are -- you know, we would be okay with basically --

5  you know, if the Court disagrees with us that it's not -- that

6  it's too confusing to understand what this is, then we would be

7  okay with having the same construction that we proposed for the

8  state machine based on the herein clause, "sequence of states

9  and transitions between those states," and I'll show you why.

10        So, go to the next.

11        So, this is from the '340 patent, we're at Column 11.

12  They talk about "both the presentation model and the

13  application model can be represented by the system modeling as

14  a sequence of states and transition between those states, also

15  referred to herein as a state machine."

16        So, it is confusing in the specification.  If I'm

17  understanding Mr. Chabib's argument, he's saying this is

18  basically a -- a state machine is a, I guess, a genus, and the

19  presentation model is a species of state machine.  I think

20  that's -- and -- and another species would be a --

21        THE COURT:  Application?

22        MR. WINTERLE:  -- application model.  But, you know,

23  it is in what -- if you'd go back one slide.

24        Again, you know, in what they're proposing as an

25  alternative construction, you know, they, again, want to stay -

83

1    - they want to avoid the sequence of language that the

2    applicant used to describe all of these things.  And so -- go

3    back -- go forward one slide.

4           So, again, here, you know, Column 11 of this patent,

5    they're talking about presentation models, they're talking

6    about application models, and they're saying these are a

7    sequence of states and transitions between those states.  And

8    then they also refer to herein as a state machine.  I mean,

9    it's confusing, perhaps intentionally so.  I don't know if Your

10   Honor encountered any patents along the way that were written

11   in the early 2000s, but it seemed like the practice at the time

12   among patent prosecutors was to use intentionally confusing

13   language.

14          We'll go to the next slide.

15          This is Figure 36.  This -- and Mr. Chabib, I

16   believe, just had this up here, you know, represented as one or

17   more state machines, presentation model, optionally,

18   application model.  Again, we just -- it was confusing enough

19   for us to understand what was being claimed here.  And given in

20   the claims, you know, I believe Claim 2 says the state machine

21   is a presentation model.  Yeah, there it is, in Slide 73.  So,

22   "wherein a first state machine is a presentation model."  So,

23   again, it's just -- it's a function of these terms sort of

24   being, I don't know, mucked-up in the specification.

25          And then, you know, if Your Honor disagrees that

84

1    they're -- you know, that it can be figured out, then we just

2    think it should get the same construction as state machine that

3    we propose.

4            THE COURT:  Okay.

5            MR. WINTERLE:  Yeah.

6            THE COURT:  All right.  Before -- let's take a quick

7    bio break, and then we'll be on a quest to the finish line

8    here, okay?

9            Be right back.

10           THE CLERK:  All rise.

11              (Recess 11:29 a.m./Reconvene 11:34 a.m.)

12           MR. CHABIB:  Okay, Your Honor, this is the second of

13   the 112(6)-related terms.  The term is "a sessions unit adapted

14   to create at least one session having session entries from the

15   at least one log entry."

16           And, again, I'll dispense with reading the proposed

17   constructions, but this is the same issue as we addressed

18   before with the project unit.  Defendants claim that the word

19   "unit" is being modified by functional language alone here, and

20   we would argue that the session is, again, structural in

21   nature, and we'll show you here in the next slide.

22           On Slide 42, "session" is defined in the patent

23   specification.  It says "the session is an ordered collection

24   of session entries."  So, in and of itself, it contains

25   "session entries."  It is structural in nature.  It is a --

85

1  that is a data structure.

2          And so because of this, because "session" is

3  structural, their argument falls apart immediately when they

4  claim that the only modifier for unit is session.

5          If we go to the next slide.  You'll see Figure 8

6  here, Your Honor.  The next slide, Conor.  Thank you.

7          "Sessions unit" contains "session entries," again,

8  that's a data structure.  And "session," which is a collection

9  of session entries, also a data structure.  This is the

10  structure of this term, Your Honor, and it is the modifier for

11  the term "unit."

12          So, again, there may be functional -- some of these

13  portions of the sessions unit may perform certain functions in

14  the claims that are recited, but it doesn't all do that.  It

15  has structure in and of itself.

16          The next slide.

17          And we argued this point in the brief on Page 60,

18  "From the claim language itself, the sessions unit has a data

19  structure of 'at least one session.'  The session data

20  structure further has 'session entries,' which are data

21  structures."

22          The session further has either a data structure or

23  reference to a data structure for "at least one log entry."

24          Again, all of those are part of the sessions unit.

25  All of those are structural and not functional in language.

1          So, again, keeping in mind that we're not using the

2     term "means" here, there's a presumption that 112(6) should not

3     apply to these claims.

4          And maybe if I preempt Your Honor's question about

5     what structure we would point to were this construed under

6     112(6).  A few cites, certainly Figures 3 and 8, and then there

7     are several citations that are in our brief on Page 57 and 58,

8     I'll read off a few.  Columns -- Column 15, Line 6 through 19;

9     Column 15, 13 through 16, 18 through 35, 36 through 67; and

10    then Column 16, 1 through 9 are some of those.  The remainder

11    is on Page 58 of the briefing.

12         But we do believe, Your Honor, that 112(6) is

13    inapplicable here because the "unit" is structural, the

14    "sessions unit" is structural in nature.

15         THE COURT:  Okay.

16         MR. WINTERLE:  So, as I mentioned earlier, Your

17    Honor, we do agree there is -- there is more description in --

18    for this term than there is for the "project unit" term.  We

19    still don't think it's enough, but I think given the

20    plaintiffs' change of heart on the session entries, which is

21    part and parcel of the function that we have pointed to here,

22    we do think this is a term subject to 112(6).  Unit is a nonce

23    word.  You know, there is quite a bit of discussion in the

24    patent about what is a session, which is not something that

25    seems to be a term of art, that persons of skill in the art --

1  is -- this is something created for these patents, a concept

2  created and described for these patents, and what a session

3  means is defined, you know.

4         And so, you know, we think it's 112(6).  You know,

5  I don't think there's enough description there; you may

6  disagree.  But if -- you know, I don't want to waste our time

7  on this.  We have more important terms to get to at this point

8  basically.

9         THE COURT:  Okay, that's fine.  We can keep going.

10        MR. MIERZEJEWSKI:  Good morning, Your Honor.  I'm

11 Chris Mierzejewski again.

12        I'll be talking about the structure claims.  So,

13 there's multiple terms that were proposed by defendants that

14 all deal with structure.

15        THE COURT:  Now we're on the '441?

16        MR. MIERZEJEWSKI:  The '441 patent, yes.

17        THE COURT:  Okay.

18        MR. MIERZEJEWSKI:  And I think that most of their

19 complaints are generally identical across the structure claims.

20 So, they, of course, are saying that there is -- that it's

21 indefinite.  And we think that the structure is clearly laid

22 out in the patent, that it's a representation of the

23 transitional links between the states.

24        We can move to the next slide.

25        So, here, the -- at the very start of the patent,

88

1    there in the abstract, it clearly sets out what the structure

2    is, specifically the first structure.  "A first structure of

3    the interactive system can be defined by transitional links

4    between those states."  And so that matches -- that's where we

5    got our proposed alternative definition from, if Your Honor

6    thinks that there needs to be some type of definition.

7         And, of course, then in Figure 1, it shows an example

8    of the type of first structure there on the right, the

9    transitional links between the objects A through H.  We think

10   that that is -- that is fairly clear.

11        And when the patent then talks about things, such as

12   restructuring, it's talking about changing of the links between

13   those objects there in Figure 1.

14        If we move to the next slide, of course, the claim

15   itself uses very similar language to what we proposed from what

16   was present in the abstract.  So, it talks about "accessing a

17   representation of the first structure."  Then it says that

18   "first structure being defined by a first plurality of

19   transitional links between the plurality of states."  That's

20   why we think that we probably don't need to provide a

21   definition of that, because it's basically embodied in the

22   claims itself.

23        Next slide.

24        Now, the defendants cite to Column 11, and they say

25   that there's this thing called a website structure that

89

1  mentions substance.  Now, I want to first make sure Your Honor

2  understands, the term in the claim is "representation of a

3  first structure."  It is not website structure.  So, the patent

4  language decided not to use website structure when declaring

5  what this claim is about.  So, we have down there at the bottom

6  where we have it from the actual claims "accessing a

7  representation of a first structure."

8          So, we think, first of all, that this citation to

9  Column 11 is a little bit of a non sequitur.  It doesn't really

10  matter, because it's defining a separate but related term,

11  whereas the patent was clear what it meant by first structure.

12          The second part is here in Column 11, it's talking

13  specifically about categories of data structures.  Right?  It's

14  saying that there's going to be some analysis done on the

15  system, and once you've done some analysis, you're going to

16  output a whole bunch of data structures.

17          There's going to be -- number one, there's going to

18  be data structures about the dimensions of the -- of the

19  website of the system.

20          Second one, there's going to be another set of data

21  structures that -- about the website structure, and there I --

22  I explicitly note "data structures" is plural, there's going to

23  be multiple of those, and certainly some of them may include

24  substance as well as conductivity.

25          But if we turn to the next page, so there on the

1  right, Figure 5 is what I'm talking about.  They're doing some

2  analysis of the system.  This is the analysis of the system.

3  Up at the top, they introduce what they call the website

4  structure, which more properly corresponds with what the first

5  structure is.  It's a representation of what is the website,

6  what are the links between the pages, etc.

7         We're then going to go through these analysis steps,

8  particularly 515, 520, 525, those are all going to be analyzing

9  user activity, plus whatever the structure is of the system,

10  and it's then going to be outputting intermediate data

11  structures, the 530 matrices and structures, which is the 530

12  matrices and structures that defendants try and point to, which

13  is not the representation of the first structure discussed in

14  Claims 1 and 10, right?

15         And then we go down -- there is the unfortunate reuse

16  of the language, website structure that the specification does

17  use, but it's particularly pointed out there's a website

18  structure in 505, and then the one that the defendants point to

19  in 530.

20         THE COURT:  I mean, the --

21         MR. MIERZEJEWSKI:  And --

22         THE COURT:  The claim, right, this representation of

23  a first structure.  But in the claim, it's -- it's talking --

24  it's the representation of the first structure of the web page,

25  right?  Is that right?

1                MR. MIERZEJEWSKI:  Yes, so -- and --

2                THE COURT:  Okay.

3                MR. MIERZEJEWSKI:  I can't remember if this one was

4    specific to web pages or systems.

5                THE COURT:  And that -- is not a website structure?

6                MR. MIERZEJEWSKI:  Is -- I'm sorry, is what not a --

7                THE COURT:  I'm just -- I'm looking at the claim.

8                MR. MIERZEJEWSKI:  Right.

9                THE COURT:  Hold on.

10                            (Pause)

11                MR. MIERZEJEWSKI:  Right, so the --

12                THE COURT:  So, it's "accessing a representation of a

13    first structure of the single website."

14                MR. MIERZEJEWSKI:  Yes.  So, it is -- it is a

15    structure of the website.  Again, there are --

16                THE COURT:  Is that different than a website

17    structure?

18                MR. MIERZEJEWSKI:  Depending upon which of the two

19    website structures you're talking about.  So, that Your Honor

20    is -- we're looking here on Page 49.  You see at the top,

21    there's a website structure 505, right?  That's basically the

22    input to the system.  What does the website look like?  What is

23    the -- what is -- what are the web pages?  What are the links

24    between those web pages?

25                Now, the 530 reference on Column 11 -- so, if you'll

1  look at the top left, where we have highlighted there datas and

2  structures and matrices 530 may divide it into various

3  categories and into the following groups.  And they did reuse

4  the name website structure, but the website structure there on

5  the top in the red is referring to data that is created as part

6  of the analysis process and is present down under 530 of Figure

7  5, as opposed to the input website structure.

8          So, there are multiple different structures that can

9  represent a website.  And the claims are specific that they are

10 talking about this first structure, which is -- which is

11 basically the web pages and the transitions between those web

12 pages.  But that can, of course, be analyzed to come up with

13 intermediate data structures, whatever is necessary for the

14 system to actually start to come up with these suggestions of

15 how we can change things.  So, these are the things that will

16 make it better.

17         And so, the only reference that defendants can point

18 to that starts to assert anything about substance is this

19 intermediate representation that's after a whole lot of

20 analysis of the system.  It's not the website of the structure

21 and the terms of this web page links to this other web page,

22 such as we saw in Figure 1 with object A through -- A through

23 H.

24         THE COURT:  Okay.  And the alternative construction

25 that plaintiff provided here, "representation of transitional

93

1  links between states."

2          MR. MIERZEJEWSKI:  Yes.

3          THE COURT:  Is it clear that that would include

4  substance and connectivity, or one or the other, or both?

5          MR. MIERZEJEWSKI:  Your Honor, it would include the

6  connectivity because this patent is focusing upon the links

7  between the web pages.

8          So, I think we mentioned the brief, for example, this

9  is -- this is not talking about a case of the CEO gets on his

10 website, looks at his "about" page and says, "I'd rather be

11 called Robert than Rob," and changing that one word of

12 substance.  That is not what this patent is talking about.

13         This patent is talking about they're taking -- for

14 example, determining that it's taking too many clicks to get

15 from one point in the website to another.  So, adding a click,

16 rearranging the links, however, to make it easier for the users

17 to use.

18         THE COURT:  Okay, all right.  Got it.

19         MR. MIERZEJEWSKI:  Okay.

20         MR. VINCENT:  I appreciate Your Honor's framing at

21 the end there about whether plaintiffs' alternative

22 construction includes structure or structure and substance,

23 because I think that's the most useful framing or structure, if

24 you will, for analyzing this dispute here.

25         So, in brief, Ignite just says that it does not

94

1    include both substance and connectivity.  But, unfortunately,

2    the specification says that it might, and that's wherein the

3    problem lies.

4              Next slide, please.

5              So, here we've laid out the key citations that the

6    parties have raised.  The left here on the -- on the left side,

7    this is the passage in the abstract that plaintiff has

8    highlighted.  "A first structure of the interactive system can

9    be defined by transitional links between those states."

10             So, right up at the top of the patent, it teases that

11   it's not going to explicitly define this term for you, so

12   reader beware that it can shift as the patent is read, and

13   that's indeed what happens here.

14             I'll also note that earlier today, we heard with

15   regard to the state machine term that plaintiff believes that

16   for a specification to define a term, it has to be absolute and

17   clear, and I would agree with that.  In this case here, this --

18   this passage in the abstract is neither.  So, the effect of

19   this can be a defined phrase does not -- clearly does not

20   define the transitional links.  If anything, it's support for

21   the ambiguity of this term.

22             Below that, here's the claim language on the left

23   side.  "The first structure being defined by a first plurality

24   of transitional links between the plurality of the states of

25   the single website."  Obviously, that does include structure,

95

1   but it's uncertain whether that also includes the connectivity,

2   because obviously, you need to read the terms in context with

3   the specification as a whole.  And for a person of ordinary

4   skill to understand what these peculiar terms mean, you would

5   go to the specification.

6          And on the right side, you've got examples of the

7   specification telling you just the opposite.  So, this is the

8   website structure passage that we were just talking about, data

9   structures that illustrate the website in terms of substance

10  and connectivity.

11         As Your Honor pointed out, the claim here that we're

12  dealing with does deal with a single website.  So, it would

13  make sense to look to this passage to tell you what a website

14  structure is.  And it says in black and white, "structure and

15  connectivity" here.

16         In addition, Figure 1 -- both sides rely on Figure 1,

17  but apparently we're looking at it with a different

18  perspective.  Plaintiff focuses on the arrows, naturally, for

19  the connectivity part.  But there are boxes in there, and it

20  shows you what substance is being connected.  So, it's

21  ambiguous.

22         I'll also note that at 261 through '63, where it

23  explains what Figure 1 is, it says it is "a structure diagram

24  illustrating exemplary embodiment of the website construction

25  and the interconnections of objects of interest."  So, it's

96

1    saying, yes, there are interconnections of objects of interest,

2    but there's also website construction within Figure 1.

3         So, Figure 1 tells you more than just connections.

4    There's construction.  There's substance to it, as well.  So,

5    again, more question marks.  It's not answering things.  It's

6    just raising more questions.

7         Next slide, please.

8         I admit I'm a little lost with how Figure 5 is

9    persuasive to plaintiffs' case here.  It -- to use plaintiffs'

10   term, it is unfortunate that the specification perhaps defined

11   and then redefined website structure, using it dynamically

12   within the instance of a single embodiment.  We can't rewrite

13   the patent for them.  We can't guess at what they meant, but

14   all we can see is that they called website structure something

15   at 505, and then plaintiff says that website structure at 530

16   means something completely different.  One has substance and

17   connectivity.  One only has connectivity.  So, again, more

18   question marks.

19        I would refer Your Honor to the IQASR brief that --

20   case that we cited in the brief, 825 F. App'x 900.  And I think

21   that case is particularly instructive here because it does say

22   that in the instance where you have conflicting multiple

23   definitions in a specification, that is -- that is something

24   that weighs in favor of an indefiniteness finding here.  Even

25   if a claim term by itself might be ordinarily plain and clear,

97

1  if the specification gets -- mucks it up and adds ambiguity,

2  it's not the case of the -- the term -- the claim term itself

3  will trump.  You need to read it in the context of the entire

4  patent.

5           And so, once you read everything and digest what the

6  patentee was trying to teach us, we're -- we're not left with

7  any certainty as to exactly what a first structure means here.

8  And so we -- we would -- we believe this term should be as

9  indefinite.

10          THE COURT:  One moment.

11                      (Pause)

12          THE COURT:  What happens if I were to agree that the

13 term "structure" in the claim is broad enough to encompass both

14 substance and connectivity?  If I were to conclude that, then I

15 would also conclude the claim is not indefinite, and -- but I

16 would also reject plaintiffs' proposed construction.  So what

17 would I do then, in your view?

18          MR. VINCENT:  In terms of the effect on infringement?

19          THE COURT:  Yeah.  Suppose I disagree with -- suppose

20 I disagree with both of you.  I disagree the claim is

21 indefinite, but I also disagree that it's limited to just

22 connectivity.  What should I do?

23          MR. VINCENT:  In terms -- if it's -- if it's limited

24 to anything, it would be limited to structure -- structure and

25 connectivity.  Right?

98

1          THE COURT:  But how do I -- how would -- how would

2     that be expressed in a claim construction?  Instead of

3     representation of transitional links between states, what would

4     you suggest?

5          MR. VINCENT:  A representation of a first structure

6     would be a representation of -- let's see -- transitional links

7     and -- between states and the -- the substance of those states.

8     It would include both.

9          THE COURT:  Okay.

10          MR. VINCENT:  Again, I don't -- I don't think that's

11     the proper construction, but it's certainly -- it's certainly

12     better than plaintiffs.

13          THE COURT:  Okay.  Got it.

14          MR. VINCENT:  Thank you.

15          MR. MIERZEJEWSKI:  Okay, Your Honor, just to clarify,

16     I'm not saying that you cannot have a representation of a

17     structure that does include content.  But here, for this claim,

18     you're talking about a particular representation of the

19     structure that is focused on links.

20          THE COURT:  How do I know you're not unduly narrowing

21     the claim in that way?

22          MR. MIERZEJEWSKI:  For that, I -- as I said, I refer

23     back to the abstract that talks about there's a representation

24     that focuses on the links between the state transitions, as

25     well as the claim language itself.

99

1    If we can bring up Slide 47 again?

2    That it talks -- it -- here, specifically, it talks

3 about which types of the structures it cares about.  Because

4 there's multiple types of structures that are possible.  And

5 for this claim, this first structure that it cares about, what

6 it cares about is the transitional links that are between the

7 plurality of states.

8    While there may be -- I think this uses second

9 structure elsewhere, there may be a fifth structure or a sixth

10 structure that are all unclaimed that additionally include and

11 care about content.  The first structure, as claimed in Claims

12 1 and 10, is for the transitional links.

13    THE COURT:  Okay.

14    MR. MIERZEJEWSKI:  If we can move to Slide 50?

15    Your Honor, we've already talked a little bit about

16 session data.  I think the argument is pretty much similar, so

17 I'm hoping we can get through this one really, really quick.

18 They still try to add sequential to the '441 patent's use of

19 session data.

20    There are a couple of things that are unique to the

21 '441 patents that I don't think were as clear in the other

22 patents.

23    If we can move to the next slide?

24    So, again, here in the abstract, it, again, talks

25 about session data in the abstract.  This is where we roughly

100

1   get the construction we -- we're using.  That namely that

2   "session data can represent user navigation through the

3   states."  So, when it introduces session data, it doesn't talk

4   about sequentiality at all.

5          If we can then move to the next slide.

6          If Your Honor reads through, particularly for this

7   claim term under this patent, defendants spend a lot of time

8   arguing about the term "session," not "session data."  A

9   session is -- plaintiffs have even agreed.  A session is the

10  user actually going through live the website --

11         THE COURT:  Which is --

12         MR. MIERZEJEWSKI:  -- and clicking on things.

13         THE COURT:  Which is sequential by its nature.

14         MR. MIERZEJEWSKI:  Right, is -- by the mere fact that

15  I, as a user of a website and moving along a timeline, I'm

16  going to do things sequentially.  But when the analysis system

17  decides we're going to capture data about the session, it can

18  decide we're going to capture the sequentiality of the data as

19  well, or it's just going to focus on data without the

20  sequentiality.  Where the person is coming from; what website

21  they're -- what website browser they are using; which pages

22  they visit.  That's still session data because it's data about

23  the session, but it doesn't have to capture everything.

24         I'm sure you've looked at baseball cards, or other

25  types of cards.  They include important statistics about stuff,

1  but they don't include everything about the player, right?

2  They don't include, hey, this is what he batted against right-

3  handed pitchers versus left-handed pitchers.  This is -- these

4  are the types of errors that he made.  This is how many minutes

5  they played in the game or how many innings they played in the

6  game.

7          THE COURT:  Right.

8          MR. MIERZEJEWSKI:  All stuff that is inherently there

9  in playing a game of baseball.  But when they -- when they

10  produce player data, they just don't do that.  They just don't

11  include that on baseball cards.

12          THE COURT:  Yeah.

13          MR. MIERZEJEWSKI:  So, again -- if we can go to the

14  next -- I'm sorry, that's the last slide for this one.  You

15  just reminded that this is -- this is -- the Court needs to

16  construe "session data" and not "sessions," which the

17  defendants spend most of their time on.

18          Thank you.

19          MR. WINTERLE:  So, this is the same term that we

20  looked at for the '134 patent -- I always get that one wrong.

21  I think it's '134.

22          THE COURT:  You know what happens is, you have some

23  big case that lasts a big chunk of your life, and there's some

24  three-digit number in it that gets burned in your head, and you

25  can never have another case with a slight variation on that

102

1  number.

2          MR. WINTERLE:  Yeah, yeah, that's --

3          THE COURT:  Yeah.

4          MR. WINTERLE:  Yes, the slight variations are the

5  killers, yes, absolutely.

6                         (Laughter)

7          MR. WINTERLE:  I've had a '144 patent case, yes.

8          THE COURT:  Yeah.

9          MR. WINTERLE:  Yeah.  So -- if you'd go to the next

10  slide.

11          So, session data representing the actual user

12  navigation, right?  This patent, like the other patents --

13  actually, this is really two patents, right?  Because there's

14  two related patents, '726 and '441, both -- these patents, like

15  the other two patents, were discussed.

16          Same concept, right, in terms of you want to know

17  what did -- you know, you want to look at, okay, what did users

18  do on the website?  What did I want them to do?  What did I

19  expect them to do?  And then what did they do?  I want to

20  compare what they did to what's modeled, and so I can figure

21  out how to improve the website.  And that may not be an actual

22  improvement for the consumer, or something like that.  It might

23  make it -- try to make a website more money, or -- or am I --

24  am I spending more time at the website, see more

25  advertisements, and Lord knows.

103

1    But it is -- the session data has to represent

2 something, right?  And so, you know, the -- the actual -- you

3 know, here, you've got the '441 patent, I mean, in Claim 1,

4 they're talking about it has to represent the actual user

5 navigation, right?  And if it's not showing the sequential

6 nature of the navigation, which -- and between the various

7 states, it's -- it's not very useful in terms of accomplishing

8 any purported, you know, improvement over the prior art.

9    You can go to the next slide.

10    And so, at Column 4 of the '441 patent, it talks

11 about, you know, okay, so what do you do, you know, when you're

12 doing this analysis, right?  What are some things you can do?

13 And these are the, you know, the user sessions, right?  You

14 want to -- you want to figure, okay, what were -- you know, you

15 create these user sessions based on the log data, and there's

16 these dimensions of it, right?  The identity, okay, I get, you

17 know?  Who's accessing the site?  That's so you can figure out

18 -- I mean, a session is defined as a particular, you know,

19 user's use, navigation through a site.

20    And then, which pages did each user access, and in

21 what order, right?  And that's the sequentiality, right?  That

22 is -- that is the thrust of this, what -- in what order, right?

23 You need -- you need to know that so that you can improve the

24 thing.

25    And then it talks about the timing.  You know, when

104

1    did the access occur?  I mean, and that's something that you

2    get, you know, they -- they basically are recreating this after

3    the fact.  Facts based on all this log data, they can recreate

4    these sessions.  They may not have all the data, but they can

5    recreate them based on the times, and when people did things,

6    and they -- they define what is a session based on it not being

7    too long between the start and the end, and, you know, these

8    things in between.

9              You can go to the next slide.

10             And they give examples, you know, Column 12.  And --

11   and these examples, you know, here's a session, one to two to

12   three to four.  You know, they started by accessing object one,

13   then two, three, and four, by this order.  I mean, the same

14   thing in Column 5 of the '441 patent.  You know, they're going

15   to the first object, and the second object, and then, you know,

16   sort of, A, B, A, C.  And they use these logs of data to

17   reconstruct the sequences.

18             This sequentiality aspect is just basically part and

19   parcel of this whole concept that's described throughout these

20   patents, some of which are, as I mentioned before, 80 columns

21   deep.  So I just -- trying to exclude that is, sort of, makes

22   no sense to me.

23             You can go to the next slide.  Or is this the last

24   slide?

25             THE COURT:  Okay.

1          MR. WINTERLE:  That's it.

2          So unless Your Honor has any questions, I'm happy to

3  sit down.

4          THE COURT:  No, I understand that dispute.

5          MR. WINTERLE:  Thank you, Your Honor.

6          MR. MIERZEJEWSKI:  Okay, Your Honor, at least in my

7  opinion, this is the last effective dispute that we have to

8  discuss as far as claim construction, because everything else

9  depends upon something either from the thing we just spoke

10  about for structure, where, here, we're talking about

11  generating versus determining.

12          So what I understand is that the defendant is saying

13  that because we declared in one case that the claim can

14  generate a second structure, and in a different claim, we say

15  that it can determine a second structure, that that somehow

16  makes it indefinite.

17          And, Your Honor, I would disagree.  I would say,

18  first of all, their argument wouldn't exist if we just hadn't

19  had Claim 10 ever as part of the patent.  And then there would

20  be no argument that generating the second structure is

21  indefinite due to the term "generating."

22          And I find it odd to think that because we combine

23  two otherwise definite words in two separate independent

24  claims, that that somehow invalidates those claims.

25          So, Your Honor, there is -- there is a difference

1  between generating and determining.  As patentees, we're stuck

2  with the English language for how we choose what happens, but

3  there is a nuanced difference between generating and

4  determining.

5          And as patentees, we are allowed to use those

6  different terms to capture that slightly different term scope.

7  And as we see here, if Your Honor thinks that generating and

8  determining are not English enough words for the jury to

9  understand, we're proposing that "generating" is basically

10 meaning defining in this case, and that "determining" requires

11 more of a calculation to be made.

12          If we could go to the next slide.

13          We basically just took this -- we looked up the -- we

14 looked up the definitions on Merriam-Webster.com, and this is -

15 - this is how they basically decided and distinguished them.

16 Of the definitions provided, these -- these tended to be as

17 closely aligned as what we thought these terms were trying to

18 capture within the claims.  For generate is to define; and

19 determine, more of a calculation.

20          Next term -- next slide.

21          We admit, you look in the thesaurus, generate and

22 determine are similar words.  They're not the closest words

23 there in the thesaurus.  You'll notice, we have to go down

24 quite a few words before we get to determine when we look at

25 generate.  Oddly enough, while determine is a synonym for

107

1  generate, the thesaurus didn't think that generate was a

2  synonym for determine.  They didn't show up.

3          But in either case, there are slightly different

4  nuanced meanings of what these words are, and that is perfectly

5  acceptable in patent law, as long as a person could look at

6  them and say, "Yes, I know what that term means."

7          That is all.  As I say --

8          THE COURT:  Could you --

9          MR. MIERZEJEWSKI:  -- I can up here --

10          THE COURT:  Could you put the argument in the

11  context of the two claims, of Claim 1 and 10?  Like, I'm

12  looking at Claim 1 --

13          MR. MIERZEJEWSKI:  Right.

14          THE COURT:  -- and the "generating the second

15  structure" is in the last clause, you know, surrounded by

16  things that are going on in the computer program.

17          And in Claim 10, it's in second to last clause, well,

18  right before the "wherein," and it's surrounded by some --

19  maybe some different contexts.

20          Is there anything in the -- between the two claims

21  that would clue me into generating versus determining?

22          MR. MIERZEJEWSKI:  I do not recall anything else in

23  the context of the claims that provide any additional guidance

24  as far as what's a generation versus a determining.  I think

25  that's just inherent in the natural use of the words, which, as

1  I say, I consider -- I consider generating is just -- is more

2  of a -- is more of a, "Hey, whatever you want to generate that

3  as."  There's less restrictions on what you can do to generate

4  something.  You could roll a die, and that generates a number.

5  But you can't roll a die and consider that to be calculating

6  the number.  You'd have to do some other -- some other process

7  to do a calculation, rather than just generating.

8          THE COURT:  Okay.

9          MR. MIERZEJEWSKI:  So, I -- I kind of -- determining

10  is kind of a subcategory, you could say, of generating.  It's a

11  specialized type of determining.

12          THE COURT:  What is -- in the claim -- in the claims

13  of the '441 patent, what is the point of the second structure

14  coming into existence or being manipulated in some way?  What

15  is the --

16          MR. MIERZEJEWSKI:  Right.  The -- the second

17  structure is basically the recommendation of how to change the

18  website.  It's the idea that you'll have a first structure,

19  that is how the website currently is.  That's what users are

20  using.  Then you analyze how the users are using that website,

21  and you say -- some of the claims talked about anomalies, some

22  of the claims talk about -- talk about other types of ways.  We

23  determine that -- if you're a home mortgage site, for example,

24  maybe what you care about is enough people saying, "apply now."

25  And they want to figure out how do we get more people to do

1  apply now.  And maybe the problem is, is that you have to go

2  through a series of seven links before you ever see an "apply

3  now" button.  And maybe the system goes through that and says,

4  well, we've got to figure out some way to get people to click

5  on that button more often.  Maybe it's that we put it on the

6  homepage.  We put it on the homepage, here's an "apply now"

7  button, we link directly from the homepage to the loan

8  application page.

9           Or maybe it thinks that no, actually what we want to

10 do is we want to go to the "check the rates page" on the

11 website first.  And once they've checked the rates, and they've

12 seen how good the rates are, then we want an "apply now" on top

13 of that, and maybe we want to be "apply now" to go specifically

14 to, "I'm interested in an ARM mortgage.  I'm interested in a

15 fixed mortgage."

16          And so that's what the second structure is, it's

17 saying, how can we change the website in a way that we think

18 will improve whatever task they want to have accomplished.

19          THE COURT:  Okay, I got it.

20          MR. MIERZEJEWSKI:  And as I said, I think all the

21 rest of the terms are just going to go straight from that, but

22 if Your Honor thinks there's anything other -- in particular,

23 I'll come back up here and talk about it.

24          THE COURT:  Okay.

25          MR. VINCENT:  I agree with plaintiff that this is

1  just about the end, so all the other terms will depend on this

2  one here.

3         So, the larger term "generating a second structure"

4  is indefinite for the reasons we discussed with regard to the

5  representation of the first structure, because of the structure

6  term.  What we're talking about now is the second independent

7  ground for it being indefinite, this generating-determining

8  feature.

9         Next slide, please.

10         Again, I agree with plaintiff.  The claims themselves

11  don't really offer a lot of help here.  Claim 1 and Claim 10,

12  the two claims with the switch of terms here, they're very,

13  very similar.  So, there's not a lot of clues in there that

14  would give us help to understand what it would mean to generate

15  versus what it would mean to determine.

16         Where I will disagree with plaintiff is their -- the

17  example they gave where two otherwise definite claims could be

18  indefinite when they're read side-by-side.  If you have a case

19  where you have a single claim patent, you read it, it's

20  definite, that's fine.  And then you copy-paste that into Claim

21  2, second independent claim, but you change one word, perhaps,

22  "generate" to "determine," those two claims should have

23  different scope, right?  And the only difference between the

24  two is the switch in terms.

25         So, it tells you that those terms need to be

111

1  different.  They can't be the same or else the scope would be

2  the same.  I'm not saying that's exactly the same case here.

3  Obviously, Claim 1 and Claim 10 are not perfect mirror images

4  of each other, but substantively, they're very close and we

5  don't know why the drafter chose to flip this term between the

6  two, but he or she did.  And so, it's our job to understand

7  what that means, what the -- what the import of that change

8  would be.

9       So, the fact that, you know, different terms are

10  presumed to have different meanings, that is the crux of the

11  dispute here.  The fact that plaintiff can rely on a thesaurus

12  to switch out synonyms, it doesn't really move the ball here.

13       It's helpful to highlight that these claims are all

14  in the context of a computer-implemented method.  And so, when

15  we, for example, switch out "generating" for "defining" or

16  "determining" for "calculating," that's not really -- that's

17  not really helping further the issue here, because, again,

18  we're left with the same conundrum in the context of a

19  computer-alleged invention here.  It's really hard to tell when

20  you would ever be able to determine without generating or

21  generate without determining, because there's going to be some

22  sort of intermediate result in the bits and bytes.

23       It may have been a little easier if this were an

24  actual tangible invention, but since we're talking about

25  ephemeral ideas and routines here, we're still left guessing as

112

1    to what the import of this term-switch means.  And so --

2              THE COURT:  It's not a hard and fast rule that, in a

3    context like this, two different words used in the similar

4    phrase in two different claims, that they have to have

5    different meanings.  It's a logical presumption.  It's, you

6    know, a concept of claim construction that comes up a lot, but

7    it's not -- it's not an immutable rule, right?

8              MR. VINCENT:  That's correct.  No, this -- it's not

9    dispositive, but it's certainly very uncomfortable.  The fact

10   that there are only a couple material switches between these

11   two claims, and this is one of them.  And if we're going to say

12   that means the same thing, it seems like we're ignoring some of

13   the patentee's intent here.

14             THE COURT:  Okay.

15             MR. VINCENT:  And so that's -- that's not -- that's

16   not a great place to be in.

17             THE COURT:  Okay, I get it.

18             MR. VINCENT:  Thank you.

19             THE COURT:  Okay, so that's it for the claim

20   construction.

21             All right, and then I already said to email me a copy

22   of the -- of that big giant brief, and I'll use that as a

23   template to work everything in; so, I'll do that.

24             Then --

25             MS. MOWERY:  And, Your Honor, that has been sent

1  over.

2          THE COURT:  Oh, already done.

3          MS. MOWERY:  Yes.

4          THE COURT:  Look at that.  Great.

5           So, okay, let's talk about the motion of compel

6  then.  And I guess the baton is in the plaintiffs' hand, okay.

7          MR. CIVINS:  Thank you, Your Honor.

8          THE COURT:  Since you're the movant; go ahead.  Oh,

9  you finally -- you got to talk, okay.

10         MR. CIVINS:  I finally --

11         THE COURT:  They don't let you talk about the

12  patents?  That's not --

13         MR. CIVINS:  Very rarely.

14         THE COURT:  Okay.

15                         (Laughter)

16         MR. CIVINS:  I finally have a role.

17         THE COURT:  All right.

18         MR. CIVINS:  I'll to try and be of use.

19         Obviously, Your Honor, this is -- we've spent all of

20  today on the claim construction issues.  This is a patent case.

21  It is also a trade secret and tortious interference case.

22         I want to be clear about what I understand

23  plaintiffs' production -- defendants' production to date is.

24  They have produced technical documents.  They have -- including

25  code, which we asked for.  They have produced tax returns that

1  show some of their revenue.  That is essentially it.

2          So, at the last hearing, they filed a motion to

3  compel against us, quite ironically.  We have produced -- and

4  so what we talked about was they have an obligation to produce

5  the non-ESI discovery.

6          THE COURT:  Hold on.

7          Kenny, you can take the display down.  Yeah, just

8  turn it off.

9          Go ahead.

10          MR. CIVINS:  Both parties have an obligation to

11  produce the non-ESI documents in response to the discovery

12  request.  So, we've gone, and we -- and I won't catalog it all,

13  but we've produced stuff related to Ignite's acquisition of

14  BryterCX.  We've produced technical documents for our own

15  product that I don't even think are necessarily relevant to

16  this case.  We've produced our revenue.  We've produced the

17  emails that we know went back and forth between the BryterCX

18  legacy employees to their CEO, transmitting the trade secrets.

19  They haven't produced any of that.

20          They have produced technical documentation related to

21  the patent case and tax returns.

22          We don't have revenue.  We have asked repeatedly for

23  their revenue reports, standard financials that they would run

24  as they keep in their accounting systems showing the revenue

25  for the accused products.

115

1          And, importantly, Your Honor, they've taken the
2    position that -- they have now -- they have reported their
3    revenue in response to an interrogatory, but we don't have any
4    documentation.

5          And they've taken the position that their revenue --
6    they can't break out revenue associated with the accused
7    products.  That's just not the way to keep it.  Okay, but we
8    need to be able to look at, in order to even begin any damages
9    analysis, their revenue reports.  Standard in any patent case
10   or trade secret case, those documents need to be produced.
11   They haven't given them to us.

12         They haven't identified a single customer despite
13   requests.  They haven't -- they haven't produced a single
14   agreement with any customer.

15         They have not produced any of their -- and we've met
16   and conferred about this, and they agreed that they would
17   search for and produce, and I still haven't heard -- and -- and
18   they said they would produce them within three weeks; I think
19   that was back during our August 28th meet and confer.

20         What we're looking for -- and their response to what
21   our motion to compel was, we've get them into code, they
22   haven't looked at the code.  You know, what is it about that
23   we've produce that's insufficient?

24         I'm not talking about the technical production that
25   we need to do to update our infringement contentions, which we

116

1  will do.  I'm talking about documents related to indirect

2  infringement, documents relating to how they teach their

3  customers how to implement.  And they have produced, you know,

4  one, sort of, type of document that does that.

5       But during my meet and confer with Mr. Winterle back

6  in August, he said he didn't know, he said, I'm not sure if we

7  have that stuff, we'll go look.  And to date, we haven't gotten

8  any update.  We haven't gotten any production on any of that

9  stuff.

10      We know for a fact, and we've had this dispute with

11 them, there are a bunch of PowerPoint presentations that we

12 found reference to in public -- publicly available information,

13 and YouTube presentations that we've gathered ourselves that

14 are public.  And they've taken the position they don't have an

15 obligation to produce those, even though they're in their

16 possession, custody, or control because they're public.

17      Well, we believe there's a bunch of that stuff that's

18 -- one, we think it is their obligation to produce that anyway.

19 But, two, we've seen references to PowerPoint presentations

20 given at conferences and things that haven't been produced.

21 So, they're sitting on all this stuff that they have yet to

22 search for and produce at all.

23      We have gone back -- as Your Honor knows from these

24 hearings, there were emails and documents that went back and

25 forth that we went back and manually gathered and collected.

1 They haven't done any of that.  We have not gotten a single

2 document related to the trade secret part of this case.

3        I understand -- and we're currently going through

4 this process of exchanging search terms, and custodians, and

5 all that, and that's fine, and we'll do that.  But that does

6 not obviate their responsibility to go and get the emails that

7 they know their CEO received; to go and get the documents that

8 they know were transmitted by BryterCX employees.  We haven't

9 gotten a single document from them on this stuff.

10       THE COURT:  Well, but if the -- if that stuff is ESI,

11 within the ESI agreement, why would they have to especially get

12 it for some reason?

13       MR. CIVINS:  Why would they have to --

14       THE COURT:  To go especially get certain ESI

15 documents.

16       MR. CIVINS:  That's what we were ordered to do in the

17 last hearing is --

18       THE COURT:  Okay.

19       MR. CIVINS:  That's -- this is exactly what we talked

20 about.  So I said, yeah, there -- you said, well, it's -- a lot

21 of the stuff we've already produced may come up during these

22 searches.  So these searches are designed to gather as much

23 relevant information as possible, and we're going to balance

24 the burdens, and all that stuff.

25       But if -- if we know for a fact, as I stand here,

118

1  because I produced them and their CEO has this information, I

2  mean, there -- there are emails that they got from BryterCX,

3  and then when their CEO received it, who knows what he did with

4  it?  Maybe nothing.  Maybe he sent emails.

5          But -- but we don't have to rely on the ESI -- the --

6  the purpose of the ESI process is to go and capture as much

7  relevant stuff as possible while balancing the burdens.

8          But if we know that that stuff is there, and they

9  could go get it today, they still have an obligation to go

10  get that, just like we did.  And that's what we were ordered to

11  do at the last hearing, and that's everything we produced to

12  date.

13          So, the fact that an email or a document that was --

14  was transmitted -- and it may come up in the ESI search, it

15  doesn't obviate their obligation to go get it and produce it to

16  us.  For all I know, there are some of these documents that,

17  you know, they may have been using code words because they were

18  stealing their trade secrets.  I'm not saying that that

19  happened or not, but we know that there were a few high-level

20  executives receiving information from these legacy employees,

21  and it's a very narrow window here that we're talking about.

22  They haven't gathered a shred of that information, and it --

23  there -- it doesn't obviate their obligation to go and gather

24  that just because we're trying to negotiate search terms, you

25  know, it's not battleship.  I mean, if we get the search terms

1  wrong, they still have an obligation to gather and produce

2  relevant information.

3          ESI is designed to sort of capture and supplement all

4  this stuff, but it doesn't obviate their obligation to produce

5  revenue information, customer agreements, marketing

6  information, you know, PowerPoint presentations, or any of this

7  due diligence information that they claim that they went

8  through when they -- and they've told me, you know, in

9  fairness, during the meet and confer that a lot of this due

10 diligence information was in a secure data room, and they don't

11 have access to it.

12         But certainly, we've already provided documents and

13 produced them in this case.  They went back and forth between

14 their CEO and these folks that left the company, and they

15 haven't given them to us.  And I don't think it's proper to

16 wait until the ESI process to go get the documents that we know

17 are there.  At the very least, the substantive attachments and

18 trade secrets that were transmitted, they still have that

19 obligation to go and look for that.  I mean, it's -- we're not

20 talking about a bunch of people, and we're not talking about a

21 big time frame.

22         THE COURT:  Okay, I understand.

23         MR. WINTERLE:  It does not surprise me that the

24 attorney who signed the 711 statement for this motion is not

25 present today, because it was false.  And as we pointed out in

1  our opposition, they filed a motion.  So, Your Honor gave a

2  couple of orders on our motions to compel, I think it was the

3  middle of November; I can't remember when it was.  It had some

4  deadlines in there, including an ESI-related deadline.  You

5  know, on December 6th, "Get after it, you guys.  Figure this

6  out.  Get a plan.  Get moving on this stuff."

7          And so that's what we were doing, and that's what we

8  were working on, in addition to the surreply brief on claim

9  construction that we ended up filing, moved one date to the --

10 whatever that Monday was, Thanksgiving week.

11         Instead of getting an email about ESI, search terms,

12 or planning for that, or something like that, like Your Honor

13 ordered us to do, I got an email, I think they attached it to

14 their motion, the Thursday night before Thanksgiving, raising a

15 bunch of issues we had never conferred about.  They wanted our

16 documents about planning for our software; going back before

17 2017; the development.  They, again, brought up this -- some of

18 it we had talked about before, months before, about, like, the

19 YouTube videos, and we told them our position on that.

20         And so as we then, you know, we were still working on

21 our ESI and surreply brief, then we get this motion filed

22 unexpectedly, and it raises a whole host of new issues,

23 including the customer identity issue, which we -- the parties

24 still haven't conferred about.  I'm happy to confer with him

25 about that.  ███████████████████████████████████████████

8    And so I'm happy to talk to him about that, and
9    protections we can take, and what we can do.  But, you know,
10   that relates to the patent claims.  And I still don't have
11   comprehensible infringement contentions.  And they begged you
12   for the source code.  And they asked for it, and they asked for
13   it, and they were asking me for it, you know, seconds after we
14   did our disclosures in April or May, June, whatever month that
15   was.  That's all been sitting there in my office in Dallas,
16   Texas for -- what is it this week, seven weeks?  Even after we
17   filed our opposition, I thought for sure on Monday after
18   opposition, they would set a time to come review the code.

19   Instead they're, you know, asking for all these other
20   things about the code.  I think, you know, a first step in a
21   patent case is to provide something that is, you know,
22   comprehensible in terms of what they think actually infringes.

23   And it's unfortunate, but we spent a lot of time here
24   today dealing with claim terms in dependent claims because they
25   asserted 62 claims, I think, against us across the four

1   patents.  And most of the infringement contentions are complete
2   garbage.

3        And so that's why -- I'm -- we gave them all the code
4   going all the way back to 2017, because I want to see what they
5   actually think infringes.  And before they need to go see what
6   my customers do, or what I'm educating my customers about, or
7   anything like that, why don't -- why don't they point to
8   something in the code as to what they actually think infringes.
9   What is actually restructuring in these patents?  I can't tell
10  from their -- from their -- we heard a lot of talk today about
11  what these patents are about, and the reorganizing of websites,
12  and the changing of hyperlinks, and things like that.  That is
13  not what my clients do.

14       And so my clients are still perplexed, why are we in
15  this patent suit?  And they can't tell.  And we've given them
16  our source code, and now they're asking us for a bunch more
17  stuff.  And, you know, mind you, it's a -- it's a Belgian
18  company, and so they're -- you have the issue of a European
19  company not understanding U.S. patent law, and I have to
20  explain that to them and all that.

21       But, you know, they haven't -- you know, they said,
22  well, did they come look at our code?  No, they haven't come.
23  And now they're asking for more things, yes, they are.

24       Now, with regard to the trade secrets, it's ESI.  I
25  mean Your Honor correctly noted that.  We're working with them

123

1  on search terms.  We're going back and forth.  I thought we had

2  ironed out a lot of it.  It seems like we've gone backward in

3  the last day on some things, like date ranges and things like

4  that.  But we'll -- we'll continue to work through that.

5       We want to get them our ESI on the trade secrets

6  stuff, and here's why.  Your Honor said in that order on our

7  last motion to compel, you said, you'd better come to me on

8  January 17th with a supplemental interrogatory response.  And

9  last time what I heard was, oh, we can't -- we can't give you

10 more details because we don't have the ESI, and we don't have a

11 deposition.

12      Well, I'm going to let them know right now.  Doug

13 Gross is available for a deposition on Friday, January 10th in

14 my office in Dallas, Texas.  And we're going to have the ESI

15 out to them.  Doug Gross's ESI and as much of the other ESI as

16 we can out in advance of that.  Because I don't want -- I don't

17 want the excuses about why they can't give us the details.

18      And so that's what we're actively working towards, is

19 getting the information that we're -- that -- that is necessary

20 for this lawsuit.

21      So, I mean, yeah, I hope I'm not coming across as too

22 upset by this, but I was very upset by this motion that they

23 filed right before Thanksgiving without warning on mostly

24 things that we had never even conferred about on mostly things

25 they had never even asked to confer about with a 711 statement

124

1  that I view as false.  And their -- their reply brief doesn't

2  say that they conferred about these things, or anything like

3  that.  It says, you know, we've talked about it in emails and

4  whatever, you know, vaguely like that.

5          So, we are actively working to do this.  This -- this

6  lawsuit is an extreme burden on my clients.  We are working as

7  hard as we can.

8          Part of the reason we put the financial numbers into

9  the opposition was because, you know, I think Your Honor has to

10  keep the proportionality in mind here.  This is a huge burden

11  on our clients.

12          So, unless Your Honor has any questions for me, I'm

13  happy to sit down.

14          THE COURT:  This probably seems like a very basic

15  question in light of the detailed arguments I just heard from

16  both of you.  But my last order said that Ignite's non-ESI

17  document production will be done by December 6th, right?  And

18  that's done?

19          MR. CIVINS:  Yes, Your Honor.

20          THE COURT:  Okay.

21          MR. WINTERLE:  Yeah, they tripled their existing

22  production on December 6th.

23          MR. CIVINS:  Well, and to be --

24          THE COURT:  Okay.  I mean, you know, there's still a

25  lot of fact discovery left, but it's not like a last second

125

1  thing.

2          What about from NGData's point of view, where is

3  NGData on non-ESI production?

4          MR. WINTERLE:  So, like, you know, I'll address the

5  things that -- that I heard.  On the finance stuff, I mean,

6  it's kept in a -- in a financial database.  We disclosed that

7  under the Delaware default standard.  The details that we gave

8  them in our interrogatory response was a result of our CFO

9  going through and working to figure all that stuff out for the

10 seven or, I guess, at this point, eight-year period on that.

11         And then we gave -- you know, we tried to figure out,

12 okay, what documents do we have that relate to that.  We had

13 tax returns, came to mind, so we did that.

14         You know, I'm happy to continue to look for other

15 documents that would relate to that.  But my understanding is

16 that's what we've looked for and that's what we have.  Because

17 it --

18         THE COURT:  Well, like, a lot of the times with the

19 financial data, I understand -- it's all stored in some kind of

20 system, but normally the way -- what you do is you look at some

21 kind of detailed interrogatory, or a document requests that you

22 get, and then you have your client's financial people generate,

23 you know, some kind of detailed spreadsheet that has all the

24 right fields in it and all the data, and it's generated for the

25 litigation, so be it, right?  But then you -- and throw that

1  over the wall, and then whichever person at your client

2  understands that spreadsheet gets produced as a 30(b)(6)

3  witness to explain it, right?  That's, like, the usual thing.

4      So, is that spreadsheet not something you guys have

5  made yet?  Or --

6      MR. WINTERLE:  We -- we have -- yes, we included it

7  as an exhibit to the December -- what was the date of that?

8  December 6th supplement to Interrogatory Number 4 that the

9  spreadsheet --

10     THE COURT:  Okay.

11     MR. WINTERLE:  Now, if it -- if they want more detail

12 about that, I'm happy to talk with them in more detail about

13 that.  I mean, I don't know exactly what machinations the CFO

14 used to compile that information.  I'm guessing that there

15 probably are, you know, more data beneath that.  And if that's

16 what they were looking for, I can try to get that more data

17 beneath that.  But, you know, that wasn't the thing that was

18 posed to me.

19     On the, you know, the YouTube videos, I mean, it's --

20 it's -- you know, I don't -- we gave them the case law that we

21 believe supports our position that we don't need to produce the

22 YouTube videos; we did that in August.  And then we didn't hear

23 from them again about it until this motion was filed.

24     And so, you know, I don't know why we need to

25 provide them -- you know, find a way to produce the YouTube

1  videos that are publicly available and that they already have

2  access to.

3       On educating customers, we've asked, you know,

4  multiple times.  The information that -- that we're told is --

5  is provided to educate customers are these expert guides that

6  we gave them back in July for the -- for every version of the

7  software, going back to the beginning of the 2017 period.

8       They asked for some more technical materials and more

9  diagrams.  And then we went back to them, the client, we've

10  said, is there anything else?  And then they gave us a few more

11  things that they found, and we gave that to them.

12       And then they said, again, you know, and the rest of

13  it is really just explained by the code.  And that was the

14  argument that I heard from them in October was, like, we really

15  need the code so we can understand this stuff.  And -- and we

16  gave them the code, and then it sits there since late October

17  un-reviewed.  And I just -- I'm -- you know, I and my clients

18  are both very perplexed by the whole scenario.

19       MR. CIVINS:  Your Honor --

20       THE COURT:  Okay.

21       MR. CIVINS:  -- may I briefly respond --

22       THE COURT:  Okay.

23       MR. CIVINS:  -- to some of --

24       THE COURT:  Well, sure.  But -- hold on.  Anything

25  further from -- we'll just do, you know, one, two, three.

1  That's fine.  Anything further?

2         MR. WINTERLE:  Not unless you have any other

3  questions for me --

4         THE COURT:  No.

5         MR. WINTERLE:  -- that you might have.

6         THE COURT:  No, that's okay.

7         MR. CIVINS:  So, Your Honor, what Mr. Winterle -- his

8  entire argument was either untrue -- and Travis Hunter isn't

9  here because he's, I think, in a deposition or --

10        MS. MOWERY:  He (indiscernible - not at microphone)

11  trial --

12        MR. CIVINS:  We -- that --

13        MS. MOWERY:  -- for January 2nd.

14        MR. CIVINS:  That's why he's not here.  And I don't

15  expect Your Honor to read through all of the emails, but the

16  notion that -- and we did explicitly say that these were met

17  and conferred on, and they have been.

18        Everything that Mr. Winterle said is pure deflection.

19  He -- he's talking about the code and the patent part.  There

20  are -- at the hearing that we had, where we were ordered to

21  produce non-ESI information, and in meet and confers we had

22  with Mr. Winterle, they took the position -- and we said during

23  the hearing that there -- that everything -- that there were

24  certain things that we could have said were ESI, because they

25  will probably come up again when we do the ESI.  But we said,

129

1   yeah, there are things we could go and probably manually

2   collect related to the acquisition, related to the emails.    I

3   mean, if we had done it this way, we wouldn't have produced

4   emails with trade secrets yet.

5           They are sitting on a bunch of information that they

6   know is relevant that they haven't -- that they haven't

7   provided.  I'm not talking about the infringement contentions.

8   There is a whole other side of this case, and I don't know what

9   spreadsheet he's talking about.  I think what he's talking

10  about is the answer they gave in response to an interrogatory.

11          They have not provided exactly what Your Honor is

12  referring to, which is what you do in any of these cases, which

13  is a report.  You generate a report with revenue, and costs, or

14  whatever.  But they've given us none of that.

15          No customer agreements, which are relevant to both

16  the patent case and the trade secret part of the case.  They

17  don't get to withhold that information until they get, you

18  know, additional infringement contentions.

19          And to be clear, Your Honor, we are going to review

20  the code.  Candidly, the consultant that we use to review code

21  -- or one of the consultants that we use -- that we had planned

22  to use passed away unexpectedly.  So, it -- you know, it's --

23  we haven't gotten out there to do that.

24          But customer -- I mean, again, and their response is

25  deflection also about plan software.  Mr. Winterle knows

130

1  exactly what we're looking for, because I've -- we talked about

2  it, and he said he would look for it.

3          And -- and, again, the fact that they've given us

4  code, and they've given us a document that teaches a customer

5  how to do something doesn't obviate their discovery obligation.

6  There are PowerPoint presentations they have that they -- that

7  are not public that they haven't given us.  They haven't even

8  looked.

9          There are YouTube presentations that -- we've

10 gathered as much as we can, that they're sitting on that they

11 haven't provided.  They -- they -- they have -- he did not say

12 to you, "We don't have any marketing materials.  We don't have

13 it."  They haven't looked.  They haven't produced it.

14         All we have in this case -- to be clear, all these

15 months in, we're the plaintiff, we have produced infinitely

16 more than they have.  We have technical -- sort of the

17 technical documents sufficient to show the operation of the

18 products, which is the code and another set of documents, and

19 we have tax returns.  That is literally all we have.  And we

20 don't need to wait for this ESI process for them to produce.

21         And this notion, by the way, that they're going to

22 make their CEO available on the 10th is absurd.  We don't have

23 their documents yet.

24         And, again, we have been very clear.  We know that

25 emails were sent.  We know that there was information that was

1    transmitted.  We don't have any idea what they did with it.

2          And so now, they're going to try and take the

3    position that it's, you know, December, whatever it is, and

4    they're going to -- we're going back and forth on ESI, that

5    they're going to dump a bunch of ESI information and say, "Oh,

6    depose our CEO on your trade secret claims on January 10th."

7    That's an absolute joke.

8          Like you said, we have a bunch of discovery left.  We

9    need their documents.  We should not -- we are going to go

10   through the ESI process, but revenue, customer agreements,

11   marketing documents, none of this stuff is ESI.  They could go

12   get it right after this hearing.

13         The emails to their CEO that they -- that he knows

14   were received, they could go get those right after, and whoever

15   he sent the emails that he received, and any of the due

16   diligence-related information.

17         They're the ones that are claiming that all of the

18   access they had to BryterCX was part and parcel of their own

19   due diligence process.  It was all under that purview and,

20   therefore, nothing was wrongful.  They could have produced any

21   documentation, or a single shred of evidence showing what the

22   timing was and when they said, "We're not interested."

23         If it turns out it's all after all of this improper

24   conduct occurred, if the CEO is, like, three weeks later, is,

25   like, "We've decided not to proceed," then, yeah, maybe they've

132

1    got an argument.  They haven't given us any of that.

2           And we're, you know, however many months into this

3    case, and, again, I'm not suggesting, unless Your Honor wants,

4    you know, go to bed early, but go look at the emails I attached

5    to these motions.  We have gone back and forth, and then this

6    is what we get.

7           I mean, I'll remind Your Honor that in order to get

8    an ESI order in place, I had to file a motion to compel, and

9    they finally responded and said, "Oh, yeah, we agreed a long

10   time ago."  This is what has been required.

11          And so when I finally came -- on that first hearing,

12   he said, "Well, look, you know, come to me early and often."

13   And so, I've tried to do that.  And, again, they filed their

14   motion on us to compel.  Mr. Winterle has taken the position

15   that a bunch of the information that we had was non-ESI.

16   What's good for the goose is good for the gander.

17          All of these categories, revenue, customer

18   agreements, marketing, these emails to Doug Gross and all those

19   from the BryterCX people, and the due diligence are all

20   information that they ought to be producing to us today.

21          THE COURT:  Okay.  Okay.

22          I will get an answer on the motion to compel as soon

23   as possible.  And I'll work on the -- <u>Markman</u>, I'm not sure if

24   I'll get that done before the holidays.  Probably not, but I

25   will -- I'll be working on that.

1          Let's see.  I don't think -- any other -- any other

2    business for the case that we should talk about before we break

3    up?

4          MR. CIVINS:  Not from plaintiffs, Your Honor.

5          THE COURT:  Okay.  Okay.

6          Well, thank you for the really good claim

7    construction argument.  It was very helpful.  The slides were

8    great.  Helpful on all the issues.  And -- I forget who's who?

9    Mr. Wyatt?  Mr. Brown?  Is that who?

10          MR. VINCENT:  Mr. Avers.

11          THE COURT:  Yeah.  Give me your names again; I'm

12    sorry.  The young guys.

13          MR. AVER:  Brandon Avers.

14          THE COURT:  Avers?

15          MR. AVERS:  Yes, sir.

16          THE COURT:  Okay.  And?

17          MR. VINCENT:  Michael Vincent.

18          THE COURT:  Vincent.  Okay.  Are they -- are they pro

19    hac'd in?  Are they --

20          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

21          THE COURT:  Oh, okay.  I was just looking on the

22    docket to try to find the names.  Well, good job.  I really

23    appreciated the presentation.  Super well prepared and it was

24    very helpful, so thank you.

25          MR. WINTERLE:  Would the Court like a PDF copy of our

1    slides, as well?  We know we gave a paper copy, but I --

2            THE COURT:  Oh, you should both upload your slides to

3    the docket, if you haven't already yet.

4            MR. WINTERLE:  Okay.

5            THE COURT:  Yeah.

6            MR. WINTERLE:  Absolutely.

7            THE COURT:  It's always good to do that, I think.

8    Just so we don't lose them.

9            Okay?  Well, thank you very much.

10           MR. CIVINS:  Thank you, Your Honor.

11           THE COURT:  Yep.

12           MULTIPLE SPEAKERS:  Thank you, Your Honor.

13           THE CLERK:  All rise.

14       (Whereupon, at 12:37 p.m., the hearing was adjourned.)

15

16                      CERTIFICATE OF TRANSCRIBER

17

18       I, KAREN HARTMANN, a certified Electronic Court

19   Transcriber, certify that the foregoing is a correct transcript

20   from the electronic sound recording of the proceedings in the

21   above-entitled matter.

22

23       /s/ *Karen Hartmann*

24   Karen Hartmann, AAERT CET 475  Date: December 22, 2024

25   TRANSCRIPTS PLUS, INC.